NATIONAL SHIPPING COMPANY
OF SAUDI ARABIA (NSCSA),
Plaintiff,

v.

MORAN MID–ATLANTIC CORPORA-
TION, in personam, Moran Trade Corpo-
ration of Delaware, in personam, Moran
Towing of Virginia, Inc., a division of
Moran Mid–Atlantic Corporation, in
personam, and M/V HARRIET MORAN,
her engines, tackle, apparel, etc., in rem,
Defendants.

No. 2:95cv258.

United States District Court,
E.D. Virginia,
Norfolk Division.

April 25, 1996.

John R. Crumpler, Megan E. Burns, Kaufman & Canoles, Norfolk, VA, Patrick J. Bonner, Freehil, Hogan & Mahar, New York City, for Plaintiff.

Patrick A. Genzler, Mark T. Coberly, Vandeventer, Black, Meredith & Martin, Norfolk, VA, for Defendants Moran Mid–Atlantic Corporation, in personam, Moran Trade Corporation of Delaware, in personam, Moran Towing of Virginia, Inc., a division of Moran Mid–Atlantic Corporation, in personam, and M/V HARRIET MORAN, her engines, tackle, apparel, etc., in rem.

### *OPINION*

REBECCA BEACH SMITH, District Judge.

This controversy began on December 1, 1993, when the HARRIET MORAN, a tug owned by Defendant Moran Trade Corporation of Delaware and operated by Defendant Moran Towing of Virginia (Defendants referred to collectively as "Moran"),[1] collided with the M/V SAUDI DIRIYAH, a vessel owned and operated by Plaintiff National Shipping Company of Saudi Arabia ("NSCSA"). As a result of the collision, approximately 9,000 gallons of fuel oil spilled into the Elizabeth River. NSCSA accepted immediate responsibility for the spill and coordinated its cleanup under the Oil Pollution Act of 1990 ("OPA"). NSCSA then brought this action against Moran, claiming that the oil spill was caused by Moran's negligence. It argues that Moran is obligated to reimburse NSCSA for the cost of the cleanup and the expenses it incurred compensating victims of the spill. Moran filed a counterclaim against NSCSA, alleging that the oil spill was caused by NSCSA's negligence and seeking indemnity from NSCSA for any liability Moran faces from third party claimants.

In its Second Amended Verified Complaint, NSCSA asserts four causes of action pursuant to: (1) general maritime law; (2) Virginia's State Water Control Law, Va.Code

---

1. NSCSA did not effect proper service on the HARRIET MORAN. It apparently has abandoned its *in rem* claim against the vessel.

Ann. § 62.1–44.34:18(C)(4); (3) Virginia common law; and (4) the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.* On June 15, 1995, Moran filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. By order filed August 14, 1995, this Court granted in part Moran's motion. The Court dismissed NSCSA's claim for recovery of removal costs and the cost of compensating victims of the spill under the State Water Control Law, Va.Code Ann. 62.1–44.34:18(C)(4), and NSCSA's claim, in its original complaint, for recovery under the Clean Water Act. The Court, however, retained NSCSA's right to proceed under the State Water Control Law to recover damages to its own property resulting from the collision.

On January 16, 1996, this case came before the Court for a non-jury trial. Evidence was presented over the course of three days. On February 20, 1996, each side submitted proposed findings of fact and conclusions of law. The Court later heard closing arguments, and the matter is now ripe for determination.

## I. FINDINGS OF FACT

The M/V SAUDI DIRIYAH is a roll-on, roll-off cargo vessel of 25,036 gross registered tons with a length of 248.72 meters and a beam of 32.28 meters. The stern of the vessel is flared outward from the waterline. The reduced drag achieved by this hull configuration allows the vessel to maintain a high rate of speed while carrying a full container load. The M/V SAUDI DIRIYAH is owned and operated by NSCSA.

The HARRIET MORAN is a tug boat of 252 gross registered tons with a length of 92 feet and a beam of 29 feet. The HARRIET MORAN is owned by Moran Trade Corporation of Delaware. During the relevant time period, the tug was bareboat chartered to Moran Towing of Virginia, a division of Moran Mid–Atlantic Corporation.

### A. The Collision

On December 1, 1993, the M/V SAUDI DIRIYAH was docked at Container Berth One at the Norfolk International Terminals ("NIT") in Norfolk, Virginia. She faced due north with her starboard side against the berth. The Master of the M/V SAUDI DIRIYAH was Captain Mario Grech. The vessel was scheduled to undock and shift to Lambert's Point Docks ("Lambert's Point") at 11:00 p.m. that evening. Lambert's Point is three to four miles upstream from NIT on the Elizabeth River.

NSCSA hired Captain John R. Morey, a docking pilot, to direct the shift to Lambert's Point. NSCSA contracted with Moran to provide tug assistance. Moran provided two tugs for the shift, the CAPE HENRY and the HARRIET MORAN. The Captain of the CAPE HENRY was Alvin Doucet; the Captain of the HARRIET MORAN was William Lusk. Moran tugs had docked and undocked the M/V SAUDI DIRIYAH and her sister ships with identical hull designs on other occasions. Captain Lusk himself, on one previous occasion, docked the M/V SAUDI DIRIYAH. Captain Lusk was an experienced tug master, and he was well aware of the flared hull design of the M/V SAUDI DIRIYAH.

On the night of December 1, 1993, visibility was good, and the river was calm. Captain Morey, the docking pilot, boarded the M/V SAUDI DIRIYAH at 10:45 p.m. At about the same time, the tugs arrived at NIT. While the ship's lines were taken in, the tugs held the vessel against the pier for about fifteen minutes. The HARRIET MORAN was on the port quarter; the CAPE HENRY was on the starboard bow. During this procedure, Captain Lusk observed the cut-away, flared stern of the M/V SAUDI DIRIYAH.

The undocking began at 11:04 p.m. Captain Grech, Master of the M/V SAUDI DIRIYAH, breasted the vessel off the pier by using the ship's bow and stern thrusters. These thrusters are propellers mounted on the side of the vessel, under the water line, inside tunnels approximately two meters in diameter. Each propeller is powered by a 1,800 horsepower engine. The thrusters are used to move the vessel sideways or to turn the vessel when there is little room for manuevering.

At 11:07 p.m., after breasting the ship about 100 feet away from the pier, Captain Grech used the thrusters to make a port,

counter-clockwise turn toward the Norfolk Harbor Reach. In its pier at NIT, the M/V SAUDI DIRIYAH was heading due north. To effect the shift to Lambert's Point, which is south/southeast of NIT, the vessel had to make a 180 degree turn from her position at NIT. Because of the need to make this turn in a tight space, Captain Grech engaged the thrusters.

At 11:13 p.m., after the vessel had partially completed its 180 degree turn to port, the thrusters were stopped and the engines were ordered dead slow ahead. At this point, Captain Morey had the command of the vessel. He commenced an eleven degree starboard turn which took place over the course of 2.7 minutes. This starboard turn, or correction, was necessary to line up the vessel with the channel, while avoiding shallow water. Because the turn to starboard was slight, the thrusters were not engaged.

While the ship was making the eleven degree starboard correction, Captain Morey ordered the CAPE HENRY to lay on the starboard bow. He then radioed Captain Lusk on the HARRIET MORAN and ordered him to come in on the port quarter to assist with the turn into the river. Captain Lusk asked Captain Morey, "Do you want me to come in now?" Captain Morey responded, "No," and ordered Captain Lusk to hold off until the vessel had completed its starboard correction. After the vessel stopped turning to starboard, Captain Morey ordered Captain Lusk to come in on the port quarter to assist with the turn into the channel.[2]

At 11:16 p.m., in accordance with Captain Morey's order, Captain Lusk maneuvered the HARRIET MORAN alongside the port quarter of the M/V SAUDI DIRIYAH. Captain Lusk intended to land with the starboard shoulder of his tug against the port quarter of the ship. Instead, the stern of the tug made first contact. One of the tug's starboard quarter bitts struck the M/V SAUDI DIRIYAH and put a nine inch gash in her hull. The gash was in the flared portion of the vessel's stern near the "Dutch" chock, a place on the vessel where tugs customarily either push or pull the vessel with a rope. The collision punctured the M/V SAUDI DIRIYAH's fuel oil settling tank. Fuel oil immediately began spilling into the Elizabeth River.

Other than Captain Lusk, no one on either the M/V SAUDI DIRIYAH or the HARRIET MORAN saw, heard, or felt the collision. The M/V SAUDI DIRIYAH had no markings on her hull indicating where a tug should land or where a tug should not land. No sign alerted tug pilots to the location of the fuel oil settling tank. Captain Lusk was not advised of the flared design of M/V SAUDI DIRIYAH's hull or of the location of the fuel oil settling tank. As mentioned above, however, Captain Lusk was well aware of the vessel's flared stern, having docked and undocked the M/V SAUDI DIRIYAH and her sister ships on previous occasions. When the collision occurred, the HARRIET MORAN had no lookout other than Captain Lusk in the wheelhouse. Captain Lusk testified that if he had posted a lookout it would have been Eddie Sanders, the chief engineer, who was in the galley at the time of the collision.

Shortly after the collision occurred, Chief Engineer Sanders came onto the deck of the HARRIET MORAN and smelled a stench, which he believed to be either petroleum or bilge water. He also saw that something was being discharged from the ship. After investigating, he notified Captain Lusk that oil or messy bilge water was coming from the M/V SAUDI DIRIYAH. At 11:18 p.m., Cap-

---

2. Moran argues that Captain Morey ordered Captain Lusk to lay on the port quarter during the starboard correction. Moran insists that the stern thruster would prevent the tug from laying on the port quarter during a turn to port. Moran also argues that the times of each maneuver listed on the course recorder indicate that the collision occurred during the starboard turn. Although Moran's position is not without support, it is contradicted by the credible testimony of Captain Morey, a disinterested witness who is intimately familiar with the facts of this case. The weight of the evidence supports a finding that the contact between the M/V SAUDI DIRIYAH and the HARRIET MORAN occurred after the starboard correction was completed. Even if the collision occurred during the starboard turn, however, the Court would still reach the same conclusion, that the collision was solely caused by the negligence of Captain Lusk. See discussion infra § II(B).

tain Lusk radioed Captain Morey on the bridge of the M/V SAUDI DIRIYAH and advised him that the vessel was pumping something overboard on the port quarter. Captain Lusk testified that he told Captain Morey that oil was coming from the M/V SAUDI DIRIYAH, and that he, Captain Lusk, might have caused it. Although Captain Lusk claims he received an acknowledgement of this transmission from Captain Morey, Captain Morey testified that he does not remember receiving any information from Captain Lusk except that the M/V SAUDI DIRIYAH was pumping something overboard. After notifying Captain Morey by radio, Captain Lusk called the United States Coast Guard ("USCG") on a cellular phone to advise it of the spill.

Following his radio conversation with Captain Lusk, Captain Morey immediately advised Captain Grech, who was also on the bridge of the M/V SAUDI DIRIYAH, that something was pumping overboard. Shortly later, Chief Mate Asif Zafer Khan, posted on the stern of the M/V SAUDI DIRIYAH, called Captain Grech and informed him of a discharge from the ship. At this point, Captain Grech suspected that some sort of pollution, either oil or dirty bilge water, was being discharged into the river. Captain Grech telephoned his engine room and ordered his crew to check whether the ship was pumping anything overboard.

The crew stationed in the vessel's engine room probed for the source of the discharge. After about twenty minutes of this effort, Chief Engineer Ronald Reay searched the water with a spotlight and discovered a puncture in the vessel's shell plating around the fuel oil settling tank. Upon making this discovery, at about 11:45 p.m., the crew began gravitating oil from the settling tank to the double bottom tanks located in a lower level of the vessel. This transfer of oil could have been accomplished through the use of pumps, but gravitation was the quickest method.

While efforts were being made on the M/V SAUDI DIRIYAH to find the source of the spill and to control it, the vessel was slowly making its way to Lambert's Point. The M/V SAUDI DIRIYAH arrived at Lambert's Point, Pier P, at 12:00 midnight on December 1, 1993. Once alongside the berth, Captain Grech listed the vessel to the starboard side approximately 1.5 degrees in order to raise the puncture hole above the level of the oil in the settling tank. Oil stopped leaking from the ship between 1:00 a.m. and 1:15 a.m. on December 2, 1993.

Captain Grech testified that he gave a copy of the ship's course recorder tracing, which indicates the movements of the vessel, to the USCG. He does not know what became of the original course recorder tracing. At the time of the collision, the ship was not keeping a record of engine movements. The printing ribbon on the automatic bell logger was not operational and no handwritten bell book was kept.

As a result of the collision, NSCSA lost $3,250 in fuel oil. In addition, NSCSA spent $16,050 to repair the hole which the HARRIET MORAN punctured into the hull of the M/V SAUDI DIRIYAH.

## B. The Cleanup

Approximately 9,000 gallons of fuel oil spilled into the Elizabeth River, as a result of the collision between the HARRIET MORAN and the M/V SAUDI DIRIYAH. The oil spread throughout a wide area along the river. It stained and soiled beaches, pilings, bulkheads, piers, and boats. The oil did not, however, create any serious or long-term environmental damage.

Shortly after the M/V SAUDI DIRIYAH arrived at Lambert's Point, the USCG boarded her to investigate the spill. Captain Grech had not contacted the USCG during the shift to Lambert's Point. He claims that he could not call the USCG with his cellular phone because its batteries were dead. He did not explain why he did not radio the USCG. The USCG immediately assumed control of the cleanup and hired Industrial Marine Service ("IMS") as the spill response contractor. IMS began removal procedures in the early morning of December 2, 1993, by placing booms around the vessel to contain the spread of oil.

On December 2, 1993, the USCG designated NSCSA as the "responsible party" for the

spill under OPA. That same day, NSCSA hired Brian Pringle as the incident commander, responsible for managing and coordinating the cleanup efforts. Mr. Pringle previously served with the USCG and the Merchant Marine. For a period of time he worked as a marine surveyor. He had extensive experience in oil spill cleanup operations, including many operations involving spills of the same size or larger than the spill from the M/V SAUDI DIRIYAH. Mr. Pringle was out of state several days during the cleanup. On these days, Kenneth Meyers stood-in as acting commander. Moran appointed William Neubrand, President of Mid–Atlantic Marine Surveyors, to monitor the cleanup on its behalf. Mr. Neubrand had no operational authority over the response actions. NSCSA hired IMS as a response contractor, and IMS thereafter worked under Mr. Pringle's direction. IMS subcontracted with PetroChem and CleanAmeria to provide additional labor. NSCSA also hired two other contractors, A & A Environmental and OH Materials, to assist with the cleanup efforts.

For the first four days following the spill, the primary cleanup efforts were directed at removing all free floating oil from the river. The USCG cutter COWSLIP and four Navy vessels participated in this portion of the cleanup by skimming oil from the river. On December 6, 1993, the cleanup efforts shifted to cleaning docks, piers, wharfs, bulkheads, rip rap, and beaches in the southern, eastern, and western branches of the Elizabeth River.

During the cleanup, nightly meetings were held to discuss cleanup priorities. Members of the unified command attended these meetings. The unified command consisted of representatives from NSCSA and the USCG, as well as federal, state, and local officials. Each evening following the unified command meeting, Mr. Pringle met with Mr. Neubrand and representatives of IMS to discuss priorities and create plans for the following day. At one such meeting on December 4, 1993, Mr. Pringle, Mr. Neubrand, and IMS management personnel discussed the plan for the next stage of the cleanup effort, focussing on removal of oil from shorelines and manmade structures along the waterfront. At this meeting, Mr. Neubrand recommended the use of hot water pressure washing, using machines commonly referred to as "hotsys," as the most efficient means of removing oil from manmade structures. A hotsy sprays hot water out of a metal wand under extremely high pressure. When the wand is aimed at a polluted structure, such as a bulkhead, the pressurized water blasts oil from the surface of the structure. William P. Athayde, of IMS, likewise advised in favor of the use of hotsys. Mr. Pringle, however, believed that hand-wiping and handcleaners were the best method for removal of oil from the majority of the soiled structures.

On the evening of December 6, 1993, at the unified command meeting, the USCG issued a directive which established the priorities to be followed by NSCSA and the cleanup methods to be employed. The directive states in part:

> Low priority: Removal of Oil Adhered to Seawalls and Piers ... Techniques for removal of the oil should be initiated by physical removal by wiping or scraping. Use of detergents is not recommended. High pressure water or hot water washing may be necessary and requires recovery of released oil by sorbents and boom techniques.

Mr. Pringle interpreted this directive as requiring that shore-side structures be cleaned first by hand-wiping, and, in the event that hand-wiping proved ineffective, hotsys might then be employed. Gary L. Ott, science support coordinator for the National Oceanographic and Atmospheric Administration ("NOAA"), drafted the USCG directive. He testified that he had no additional communication with Mr. Pringle about the meaning of the directive.

Under the direction of Mr. Pringle, the response contractors cleaned oil from shore-side structures, beaches, and rip rap using a variety of techniques. Most areas were passively cleaned by deploying snare on a rope to collect free-floating oil and to work with tide changes and wave action to clean structures. Snare looks like a pom-pom. It is composed of strips of plastic, and it is very effective at absorbing oil. In rip rap and beach areas, the cleanup crew "mucked out"

oil pockets with rags and snare and sometimes flushed the rocks with hot water. Many structures were hand-wiped, or scraped, using hand cleaners and absorbent rags or snare.

In certain areas, passive techniques and hand-wiping were not completely effective. Several areas failed inspection and subsequently were cleaned using hotsys. In other areas where passive methods and hand-wiping were employed, no additional cleaning was necessary. In some areas, such as "The Hague" and "Hospital Point," hot water pressure washing was the primary method used by the contractors.

At the Tidewater Yacht Agency, a large boat pier and marina, the response contractors used hand-wiping and hand cleaners exclusively. Mr. Pringle did not use hotsys at the marina because a number of the pilings and bulkheads were deteriorated and the pressure from the hotsys might have caused structural damage. He was also worried that pressure washing along the deteriorated bulkheads may have pushed oil into the ground under the marina's parking lot. Additionally, attempts to hotsy pilings and bulkheads in the marina probably would have resulted in overspray and further damage to boats, walkways, and railings. For these reasons, Mr. Pringle determined that hand-wiping was the most cost-effective method of cleaning the marina.

Cleanup efforts ended on January 6, 1994. The next day the USCG approved the termination of response activities. NSCSA spent $868,356.80 to cleanup the oil which spilled from the M/V SAUDI DIRIYAH on December 1–2, 1993. The total expense consisted of the following: (1) $758,265.21 to IMS; (2) $1,724.82 to the City of Norfolk; (3) $524.32 to TC Analytics; (4) $57,146.47 to Woodward–Clyde; (5) $27,031.51 to Brian Pringle; (6) $16,741.97 to Kenneth Meyers; (7) $2,670.00 to marine surveyors Stott & Ogram; and (8) $4,252.50 to Martinair. In addition, the United States Navy and the USCG have asserted combined claims of approximately $300,000 for expenses incurred during their participation in the cleanup. The final amounts of these claims are, for now, undetermined.

■ Moran argues that NSCSA's cleanup expenses were unreasonable. Specifically, Moran contends that NSCSA should have limited the use of hand-wiping, and, instead, employed hot water pressure washing to clean piers, pilings, bulkheads, and other structures. Mr. Neubrand and Moran's expert, Joseph J. Ledbetter, testified that NSCSA could have saved over $300,000 in cleanup costs if it had used hotsys more often, because that method is quicker and requires fewer workers.

The Court rejects Moran's argument and finds as a fact that the cleanup expenses NSCSA incurred were reasonable. First, Mr. Pringle's interpretation of the USCG's directive was perfectly reasonable. The language of the directive suggests that the USCG wanted NSCSA to use hand-wiping first, to be followed by hot water pressure washing, if necessary. Because Mr. Pringle had no further communications with the author of the directive, Mr. Ott, the directive itself was all the guidance he received from the USCG.

Second, the evidence presented was mixed regarding methods of oil cleanup. Certain experts testified that hand-wiping was the most appropriate method, while others testified to the effectiveness of hotsys. Hand-wiping has its advantages, and it is not apparent from the evidence that the cleanup would have cost any less had hot water pressure washing been employed more often. In fact, it might have cost more if the use of hot water pressure washing caused damage to older bulkheads, piers, and pilings, as Mr. Pringle feared.

Third, Moran's criticism of NSCSA's cleanup operation is nothing more than "Monday-morning quarterbacking." If Moran truly believed that inefficient methods were being used, it could have insisted that NSCSA employ other techniques. As it happened, however, Moran never voiced a strenuous demand that NSCSA cleanup in a certain manner or a strenuous objection to what was being done. Mr. Neubrand claims he frequently insisted on the use of hotsys; however, Mr. Pringle recalls only one occasion when Mr. Neubrand took such a posi-

tion. The only written evidence of Mr. Neubrand's concern is contained in two communications to Moran. In a fax sent December 22, 1993, Mr. Neubrand complained that hotsys should have been used on the Portsmouth waterside. The second written communication expressing Mr. Neubrand's concern was dated one day before cleanup operations ceased, too late to have any impact on the cleanup. The evidence also shows that Mr. Neubrand's position during the cleanup was not consistent. On December 13, 1993, Mr. Neubrand wrote Moran and stated that he was satisfied with the cleaning position taken by NSCSA with respect to the Tidewater Yacht Agency marina, where hand-wiping was used exclusively. Certainly, during the cleanup, Mr. Neubrand did not convey his opinion on use of hotsys as strongly as he did in court over two years later. The Court will not condone Moran's second-guessing of NSCSA's choice of cleanup methods, when it failed to effectively challenge these methods during the cleanup.

## C. Third Party Complaints

The oil that spilled from the M/V SAUDI DIRIYAH soiled over 200 private vessels along the Elizabeth River. To handle complaints from those affected by the spill, NSCSA retained Turnaboat Services, Ltd. ("Turnaboat"). Turnaboat set-up and advertised a toll-free telephone number for those affected by the spill to call and report claims. A total of 240 claims were reported to Turnaboat. Of those claims, 209 were negotiated to a settlement and approximately thirty were denied. Only one reported claim, by Tidewater Yacht Agency, resulted in litigation. NSCSA paid a total of $106,806.12 in third party claims, mostly to pleasure boat owners for oil staining.

Turnaboat's fees for adjusting services totalled $174,637.70. Although this amount appears high in relation to the amount of money actually paid to third party claimants, it may be reasonable given the services provided by Turnaboat, and the likelihood that litigation, more costly than Turnaboat's fees,

could have resulted without these services. However, certain problems with the evidence regarding Turnaboat's fees prevent the Court from determining the extent to which NSCSA is entitled to recover this element of its damages.

R. Bruce Tillman of Turnaboat testified that Turnaboat's fees for the last several months were mostly for litigation support. He did not testify as to what portion of Turnaboat's fees represented services provided to NSCSA in regard to this lawsuit. NSCSA failed to introduce any evidence showing which of Turnaboat's bills were for adjusting services and which of its bills were for litigation support. The Court cannot determine on its own which portion of Turnaboat's fees are recoverable, because Turnaboat's bills, Plaintiff's Exhibit 81, the only exhibit admitted into evidence on this point, do not reveal the content of the services which each invoice represents.[3] Any decision made by the Court on this point, therefore, would be pure speculation, which the law does not allow in a damage determination. See, e.g., State Farm Fire and Casualty, Co. v. Barton, 897 F.2d 729, 733 (4th Cir.1990).

Furthermore, Mr. Tillman testified that Mr. Wiswell, an employee of Turnabout who submitted bills for work done on the M/V SAUDI DIRIYAH oil spill, was also a partner of Freehill, Hogan & Mahar, a New York law firm representing NSCSA as co-counsel in this case. Although Mr. Wiswell can certainly wear two hats, as an employee of the corporation and as a partner in the law firm, it is impossible to determine from the evidence whether Mr. Wiswell performed any services for NSCSA, as an employee of Turnaboat, in relation to NSCSA's lawsuit against Moran. Any services of Mr. Wiswell in this regard would be considered unrecoverable attorney's fees; therefore, the Court cannot ascertain whether any portion of Mr. Wiswell's fees are recoverable in this case.

For the foregoing reasons, NSCSA failed to meet its burden of proving the amount of recoverable fees paid to Turnaboat. Accordingly, the Court denies NSCSA any recovery

---

**3.** There was also testimony by Mr. Tillman concerning an incorrect bill charging NSCSA for one extra hour of work. While insignificant, the Court cannot determine which bill was referenced by Mr. Tillman.

of Turnaboat's fees as an element of its damages.

## II. CONCLUSIONS OF LAW

This matter falls within the Court's federal question and admiralty jurisdiction. *See* 28 U.S.C. §§ 1331 and 1333.

### A. Relationship Between OPA Contribution and State Common Law

From its inception, when the HARRIET MORAN collided with the M/V SAUDI DIRIYAH, this case has been governed by the Oil Pollution Act of 1990. Immediately after the M/V SAUDI DIRIYAH arrived at Lambert's Point, the USCG took control of the cleanup operations. Just hours after the spill began, the USCG designated NSCSA as the "responsible party," under the terms of

OPA. NSCSA coordinated cleanup efforts in accordance with its obligations under the Act, and it compensated the victims of the spill to the extent it believed it was liable under OPA. It is not surprising, therefore, that when NSCSA brought this action against Moran it sued under the contribution provision of OPA.[4] In addition, however, NSCSA asserts three other claims against Moran pursuant to: (1) general maritime law; (2) Virginia's State Water Control Law, Va.Code Ann. § 62.1–44.34:18(C)(4); and (3) the Virginia common law theories of subrogation,[5] indemnity, contribution, and restitution.

. Counsel for NSCSA candidly admits that these additional claims were added to allow NSCSA to recover the full amount of its cleanup expenses despite OPA's liability limitation provision. Under section 2704 of OPA, a person's liability under the Act is limited in

---

4. NSCSA sued under both the contribution and subrogation provisions of the Act. As the Court advised counsel during closing arguments, however, the proper vehicle for NSCSA's recovery against Moran is the contribution provision of OPA, rather than the subrogation provision. Section 2702(d)(1)(B) provides:

> If the responsible party alleges that the discharge or threat of a discharge was caused solely by an act or omission of a third party, the responsible party ... shall be entitled by subrogation to all rights of the United States Government and the claimant to recover removal costs or damages from the third party or the Fund paid under this subsection.

33 U.S.C. § 2702(d)(1)(B). Under the theory of subrogation, NSCSA would step into the shoes of those injured by the spill and sue Moran under the liability provisions of OPA. In this case, however, Moran is not liable to those injured by the spill under OPA. The Act only imposes liability against responsible parties, i.e., owners and operators of the discharging vessel, and third parties not under a contractual relationship with a responsible party. *See* 33 U.S.C. 2702(d)(1)(A) (stating that a third party, as described in section 2703(a)(3), may be treated as the responsible party if it was the sole cause of the spill; section 2703(a)(3) excludes from the definition of third parties those persons acting under a contractual relationship with a responsible party). In this case, Moran is not a responsible party, and, because it was operating under a contractual relationship with NSCSA, it may not be treated as a responsible party. Therefore, section 2702(d)(1)(B) is not the proper vehicle for NSCSA's recovery.

The appropriate provision, under which NSCSA may recover against Moran, is the contribution clause, section 2709: "A person may bring a civil action for contribution against any

other person who is liable or potentially liable under this chapter or another law." 33 U.S.C. § 2709.

In "Plaintiff's Supplemental Post–Trial Brief," submitted to the Court more than two weeks after closing arguments, NSCSA claims that it is also entitled to relief under section 2715 of OPA. That section states that:

> Any person, including the Fund, who pays compensation pursuant to this chapter to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of action that the claimant has under any other law.

33 U.S.C. § 2715. Although Plaintiff may be entitled to relief under section 2715, its recovery under that section would be limited to $106,-802.12, the total amount NSCSA paid to third party claimants. *See supra* § I(C). Because Plaintiff is entitled to recover this amount plus its cleanup expenses, up to $500,000, under OPA's contribution provision, the Court will construe Plaintiff's OPA claim as one for contribution pursuant to section 2709.

5. Moran notes that NSCSA's Second Verified Amended Complaint does not specifically state a claim for relief under the Virginia common law theory of subrogation. Although this is true, under the liberalized pleading rules contained in the Federal Rules of Civil Procedure, a plaintiff need not use specific language in his complaint to get relief under the law. *See* Fed.R.Civ.Pro. 8(a). NSCSA may have properly stated a claim for common law subrogation, despite not having used the word "subrogation" in its common law count. The Court need not decide whether this is the case, however, because this matter is fundamentally an OPA action, subsuming NSCSA's state law claims. *See infra* at 1448–1450.

accordance with the type and size of vessel or facility involved in the spill. 33 U.S.C. § 2704(a).[6] Although section 2704 applies specifically to "responsible parties," *id.*, the liability of a third party that causes an oil spill, like Moran, is also subject to the liability limits established in that section. 33 U.S.C. § 2702(d)(2)(A). In this case, Moran's liability for a spill caused by the HARRIET MORAN, a non-tank vessel, is limited by the greater of $600 per gross ton or $500,000. *Id.* The HARRIET MORAN is 252 gross tons, so Moran's liability under OPA is limited to $500,000, unless one of the exceptions to limitation applies.[7]

NSCSA seeks to escape OPA's limitation provision by bringing multiple counts under general maritime law, state statutory law, and state common law. First, OPA clearly preempts maritime law as to recovery of cleanup expenses and the cost of compensating injured persons. A Court exercising its admiralty jurisdiction will apply the general maritime law only in the absence of a relevant federal statute. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 2298–99, 90 L.Ed.2d 865 (1986). In this case, OPA provides NSCSA with a remedy against Moran; it, therefore, preempts the general maritime law as to recovery of cleanup expenses and the cost of compensating third parties. NSCSA argues that its maritime claim for recovery of these damages is preserved by section 2751 of OPA. That section states: "Except as otherwise provided in this chap-ter, this chapter does not affect ... admiralty and maritime law." 33 U.S.C. § 2751. However, section 2751 only preserves admiralty claims which are not addressed in OPA, such as NSCSA's claim against Moran for its collision damages. Because OPA provides a comprehensive scheme for the recovery of oil spill cleanup costs and the compensation of those injured by oil spills, the general maritime law does not apply to recovery of these types of damages.

Second, this Court has already ruled, in its order granting in part Moran's Motion to Dismiss, that NSCSA may not recover its response costs and amounts paid to third parties under Virginia's State Water Control Law. The only claims left to be considered, therefore, are those brought pursuant to Virginia common law.

Neither the Court nor counsel for the parties discovered any reported case interpreting OPA's contribution provision. The relationship between OPA's contribution provision and state common law, therefore, has not been determined. NSCSA argues that OPA's "savings clause" preserves its right to seek contribution from Moran under both OPA and state law. Section 2718(a), the savings clause, provides:

Nothing in this chapter ... shall—

(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to—

---

**6.** The congressional decision to limit a vessel owner's liability under OPA is firmly rooted in economic theory. Under the statute, the owner of a large vessel, like the M/V SAUDI DIRIYAH, is exposed to much greater liability than the owner of small vessel, like the HARRIET MORAN. *See* 33 U.S.C. § 2704(a). This scheme places the greatest exposure upon those who are in a position to obtain the most benefit from maritime commerce. Certainly, the owners of a large cargo vessel receive a greater benefit from the vessel's activity in this area than the owners of the tug boat which assists with the cargo vessel's docking procedure. The owners of large vessels, therefore, are in a better position to insure against an oil spill or to absorb the cost of a spill and pass the cost on to their customers. By placing the greatest risks of operating a vessel in the navigable waters of the United States upon those who receive the greatest benefits from doing so, the statute's liability scheme allows the costs associated with oil spills to be spread among all those who benefit from maritime commerce, including those who consume products which are shipped from overseas.

**7.** NSCSA argues that the $500,000 liability limit applies only to removal costs. NSCSA insists that it, therefore, is entitled under OPA to recover $500,000 of its removal costs plus the expenses it incurred compensating victims of the oil spill. NSCSA's position on this point contradicts the plain language of the statute, which limits "the *total liability* of a responsible party under section 2702 of this title *and any removal costs* incurred by, or on behalf of the responsible party." 33 U.S.C. § 2704(a) (emphasis added). Thus, a party's total liability under OPA is limited by § 2704, not simply its liability for removal costs.

(A) the discharge of oil or other pollution by oil within such State; or

(B) any removal activities in connection with such a discharge; or

(2) affect or be construed or interpreted to affect or modify in any way the obligations or liabilities of any person under ... State law, including common law.

33 U.S.C. § 2718(a).

■ The purpose behind the savings clause is to allow the states to impose liability upon oil polluters above the liability imposed through OPA. Congress wanted to give the states the power to force polluters to cleanup completely oil spills and to compensate the victims of oil spills, even if their liability for these remediation expenses is limited under OPA. The legislative history of the Act makes this point:

The theory behind the [savings clause] is that the Federal statute is designed to provide basic protection for the environment and victims damaged by spills of oil. Any State wishing to impose a greater degree of protection for its own resources and citizens is entitled to do so.

S.Rep. No. 94, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 728. At the time Congress enacted OPA, twenty-four states had oil spill liability and compensation laws. *Id.* Of these twenty-four, seventeen did not set any liability limitation. *Id.* Unlimited liability for polluters is based on two principles: "a polluter should pay in full for the costs of oil pollution caused by that polluter; and, a victim should be fully compensated." *Id.*[8]

■ The savings clause was added to allow the states to enact legislation protecting their citizens and their resources to a greater extent than the protection offered by OPA. It was meant to allow the states to go beyond the basic protection of the federal law. The beneficiaries of the savings clause, therefore, are the victims of oil spills. The savings clause was clearly not intended to affect liability between two vessels involved in an oil spill. Congress never intended for a party in NSCSA's position to benefit from the savings clause; companies whose ships spill oil in the waters of the United States, like NSCSA, were meant to be the victims of the savings clause, not its beneficiaries. NSCSA's interpretation of section 2718, therefore, is a distortion of the purpose behind that section's enactment.

■ NSCSA also argues that its state common law claims are preserved by section 2710(c) of OPA. Subsection (c) of section 2710, concerning indemnification agreements, states: "Nothing in this chapter ... bars a cause of action that a responsible party subject to liability under this chapter, or a guarantor, has or would have, by reason of subrogation or otherwise, against any person." The Court rejects NSCSA's argument. Subrogation would allow NSCSA to stand in the place of those third parties who were compensated by NSCSA for losses resulting from the oil spill. However, in this case, no third party has filed any state law claim. NSCSA's liability has been circumscribed completely by OPA. For this reason, and because NSCSA has a remedy against Moran under OPA, it may not hold Moran liable to an extent greater than that allowable under the Act.

From its inception, this case has been controlled by OPA. NSCSA's liability for cleaning up the oil spill and compensating its victims derived exclusively through OPA. NSCSA spent close to one and a half million dollars as a result of the spill. This amount does not even approach the liability limitation under OPA for a ship the size of the M/V SAUDI DIRIYAH. As a non-tank vessel, NSCSA's liability for a spill caused by the M/V SAUDI DIRIYAH is limited under the Act to $600 per gross ton. 33 U.S.C. § 2704(a). The M/V SAUDI DIRIYAH is 25,036 gross tons, so NSCSA's liability limitation under OPA for a spill from that vessel

---

8. Virginia imposes liability upon oil polluters in addition to the liability imposed under federal law. *See* Va.Code Ann. § 62.1–44.34:18(C)(4). The Virginia statute, however, limits a person's liability to its financial responsibility as determined by the State Water Control Board pursu-

ant to Va.Code Ann. § 62.1–44.34:16, or to $10,-000,000, whichever is greater. Va.Code Ann. § 62.1–44.34:18(H). In this case, the liability did not exceed $10,000,000, so the State Water Control Board's determination of Moran's financial responsibility is irrelevant.

is $15,021,600. Therefore, Virginia's State Water Control Law, which is meant to impose liability above that imposed through OPA, never was invoked by the state or by any claimant. Likewise, neither the state nor any third party sued NSCSA under Virginia common law.

OPA set NSCSA's liability in this case; OPA also provides NSCSA with a remedy against Moran. Section 2709 provides: "A person may bring a civil action for contribution against any other person who is liable or potentially liable under this chapter or another law." 33 U.S.C. § 2709. As discussed in detail below, Moran is liable to NSCSA under "another law," i.e., general maritime law. *See infra* § II(B). Under section 2709, therefore, NSCSA may recover from Moran money it was forced to spend as a result of Moran's negligence. Because OPA has controlled this action from the beginning, and because Congress provided in OPA a vehicle for a party in NSCSA's position to recover from negligent third parties, NSCSA must proceed under OPA. The Court will not allow NSCSA to distort the intent of the savings clause and seek contribution from Moran under a state common law theory when NSCSA's liability in no way was dependant upon state law. In this case, therefore, where NSCSA's liability was imposed exclusively under OPA, NSCSA is restricted to the contribution scheme provided in the Act. Because Moran is liable to NSCSA through section 2709 of OPA, Moran's liability is limited to $500,000 under section 2704(a), so long as no exception to limitation applies.

There may be a case, however, where a responsible party under OPA is allowed to seek contribution against a negligent third party under both OPA and state law. Consider, for example, a case where an oil spill causes one million dollars of damage, but the responsible party's liability under OPA is limited to $500,000. If the spill occurred in Virginia, the responsible party may have to pay for the full cost of the spill despite the liability limitation contained in OPA because a person's liability under Virginia's State Water Control Law may be higher than its liability under OPA. *See* Va.Code Ann.

§§ 62.1–44.34:16, 62.1–44.34:18(C) and (H).[9] If the spill was caused by the negligence of a third party, as it was in this case, it is reasonable to assume that the responsible party may: (1) sue the third party for contribution under section 2709 of OPA; and (2) be subrogated to the rights of the state and of other claimants under the State Water Control Law. In this way, the responsible party, whose ultimate liability was not restrained by OPA, could recover the full cost of the spill from the third party despite any liability limitation the third party might enjoy under OPA.

It would be manifestly unfair, in this hypothetical case, to allow the negligent third party to benefit from the protection of OPA's limitation provision while the responsible party receives no such protection. In fact, there is evidence in the legislative history that Congress intended to allow contribution actions in addition to actions brought under section 2709. *See* H.R.Cong.Rep. No. 653, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 779, 789 (stating that section 2709 is not meant to bar contribution actions under other law). The hypothetical case outlined above is a perfect example where contribution or subrogation under both OPA and state common law should be allowed.

It is important to note, however, that this hypothetical presents a very different case from the one before the Court. In the case at bar, NSCSA's liability derived exclusively from OPA. State law was never imposed to force NSCSA to cleanup the spill or to compensate its victims. This is a pure OPA case. NSCSA may not go beyond the law which defined its own liability, and which provides it with a remedy, in order to circumvent the restrictions of that law.

## B. *MORAN'S LIABILITY UNDER SECTION 2709*

Having determined that this case must be analyzed under section 2709 of OPA, at least with regard to NSCSA's claim for recovery of its cleanup costs and money it paid to third party claimants, the Court must now

---

**9.** *See supra* note 8 and accompanying text.

decide whether Moran is liable to NSCSA under OPA's contribution clause. As discussed above, section 2709 allows a person to seek contribution against another person who is liable under OPA or under "another law." Other than through section 2709, Moran is not liable under OPA because it had a contractual relationship with the responsible party, NSCSA. *See supra* note 4. The question then is whether Moran is liable to NSCSA under "another law."

This case involves a collision between two vessels on the navigable waters of the United States. This Court, therefore, has admiralty jurisdiction over the matter. *See* 28 U.S.C. § 1333. "With admiralty jurisdiction comes the application of substantive admiralty law. Absent a relevant statute, the general maritime law, as developed by the judiciary, applies." *East River S.S. Corp.*, 476 U.S. at 864, 106 S.Ct. at 2298–99 (citations omitted). Other than OPA, therefore, the law which controls Moran's liability to NSCSA is the general maritime law.

■ In its complaint, NSCSA alleges that the collision was caused by Moran's negligence and that the HARRIET MORAN was unseaworthy at the time of the accident. Negligence under maritime law is simply the failure to use reasonable care under the circumstances. 8 *Benedict on Admiralty* § 3.02[B][4] (7th ed. 1995). Unseaworthiness is similar to negligence, but relates to a condition of the vessel which renders it unfit for its intended purpose. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960).[10]

NSCSA presented ample evidence at trial to prove Moran's negligence. Negligence can be shown by a variety of acts or omissions including excessive speed, failure to use navigational aids, or failure to execute proper orders. The most common way negligence is shown in the maritime setting, however, is by proving a violation of some rule of navigation. Because the collision in this case happened on the inland waters, the parties were bound by the Inland Navigational Rules, 33 U.S.C. §§ 2001–2038. NSCSA alleges that Moran breached duties imposed by these rules and

by other federal law. NSCSA asserts violations of the federal law requiring a proper lookout, 33 U.S.C. § 2005, and the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. §§ 1201–1208, 33 C.F.R. § 26.04.

The proper lookout statute provides:

Every vessel shall at all times maintain a proper lookout by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 U.S.C. § 2005. This statute provides for a relatively broad range of factual findings regarding whether a lookout was "proper." A violation of the proper lookout statute flows from a finding of negligent conduct. *Inland Oil & Transp. Co. v. Ark–White Towing Co.*, 696 F.2d 321 (5th Cir.1983).

Likewise, the Radiotelephone Act is permissibly vague. It requires that:

Each person who is required to maintain a listening watch under section 5 of the Act shall, when necessary, transmit and confirm, on the designated frequency, the intentions of his vessel and any other information necessary for the safe navigation of vessels.

33 C.F.R. § 26.04. The question in a case involving either the Radiotelephone Act or the proper lookout statute, therefore, reverts to whether the conduct in question was negligent, in that communication was "necessary for the safe navigation of vessels," or a lookout was able to "make a full appraisal of the . . . risk of collision."

■ Litigants in admiralty cases typically allege statutory violations in order to invoke "The Pennsylvania Rule." Under this rule, established by the Supreme Court in *The Pennsylvania*, 86 U.S. (19 Wall) 125, 136, 22 L.Ed. 148 (1873), when a vessel violates one of the statutes affecting navigation, it is presumed that the violation is at least a contributing cause of the collision. The burden then shifts to the vessel to show, not merely that the violation was not, "but also that it *could not have been* a contributing cause of the

10. No evidence was presented at trial to suggest that the HARRIET MORAN was unseaworthy on the day of the collision. Apparently, NSCSA has abandoned that claim.

disaster." *In re Hellenic Lines, Ltd.*, 1984 A.M.C. 57, 69, 1982 WL 579 (E.D.Va.1982) (citation omitted) (emphasis added). The rule also applies to hold the vessel owner liable, if the owner had privity or knowledge of the violation. *Id.* Because the violation of a statute would shift the burden of proof to Moran under The Pennsylvania Rule, the Court must initially address the question of whether Moran violated any federal rule of navigation.

First, NSCSA maintains that Moran's failure to post a separate lookout on the HARRIET MORAN during the undocking maneuver constituted a violation of the proper lookout statute. NSCSA's argument on this point lacks merit. Although a tug may require a separate lookout in certain instances, when the tug is assisting a vessel in docking or undocking, no lookout other than the pilot in the wheelhouse is typically required. A tug boat serves in various capacities. *Farrell Lines, Inc. v. S.S. Birkenstein,* 207 F.Supp. 500, 506 (S.D.N.Y.1962). During certain of her duties, the tug must post a separate lookout. For instance, when a tug sails independently, the tug master may be under the same duty as the master of any other vessel to post a lookout. *Id.* at 507. A tug master may also be required to post a lookout when the tug sails with a barge in tow, particularly if the pilot's view is obscured by the barge. *See C.G. Willis, Inc. v. The Spica,* 6 F.3d 193, 198 (4th Cir.1993) (holding that "a myopic tug with a protruding and displaced tow" must post a separate lookout, while a tug without visual obstructions need not) (quoting *Esso Standard Oil Co. v. Oil Screw Tug Maluco I,* 332 F.2d 211, 214 (4th Cir.1964)); *In re Tug Harbor Star,* 433 F.Supp. 854, 864–66 (E.D.Pa.1977) (holding that a tug in the process of shortening-up its tow should have posted a lookout astern); *Farrell,* 207 F.Supp. at 507 (stating that a tug in charge of a flotilla of barges is required to post a separate lookout). The same holds true when a tug pushes a barge upriver. *See Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1159–60 (2nd Cir.1978) (holding that the pilot steering a tug is not a proper lookout when the tug is pushing a barge), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979).

When a tug assists another vessel with a docking or undocking maneuver, however, there is no absolute requirement that the tug master post a separate lookout. *Marcona Corp. v. Oil Screw Shifty III,* 615 F.2d 206, 209 (5th Cir.1980) (holding that tug operator assisting in docking another vessel did not violate the proper lookout statute, the court stated: "There is no absolute duty to maintain a lookout ... during the final stages of mooring."). Under these circumstances, whether a separate lookout is required depends upon the facts and circumstances surrounding the procedure and type of collision which resulted. *Id.*

In this case, the conditions on the night of the accident and the physical layout of the tug suggest that no separate lookout was needed. On the night of December 1, 1993, the sky was clear and the seas were calm. Captain Lusk, master of the HARRIET MORAN, was in the wheelhouse at the time of the collision with the M/V SAUDI DIRIYAH. He testified that he had an almost complete view of his surroundings through the windows of the wheelhouse. The HARRIET MORAN was laying a short distance off the port quarter of M/V SAUDI DIRIYAH. Captain Lusk testified that he had the best possible view of the ship from the wheelhouse. It does not appear that a separate lookout would have been of much assistance to the Captain.

It is also important to note the type of collision involved in this case. The lookout statute was designed to prevent collisions between vessels which could not completely observe each other's movements. When a tug assists with an undocking procedure, the tug pilot has a clear view of the other vessel from the wheelhouse. Moreover, a controlled collision is intended. Under these circumstances, involving this type of collision, the federal navigational rules do not require a tug to post a separate lookout. *See Farrell,* 207 F.Supp. at 507.

Second, NSCSA argues that Moran violated the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. 1201–1208, 33 C.F.R. § 26.04. Specifically, NSCSA con-

tends that Captain Lusk should have radioed the docking pilot, Captain Morey, immediately after the collision and informed him that the discharge from the M/V SAUDI DIRIYAH flowed from a rupture in the hull caused by a collision with the HARRIET MORAN. Contradictory evidence on this point was presented at trial. Captain Lusk claims that he told Captain Morey that he may have caused the discharge. Captain Morey insists that he never received that information from Captain Lusk. Even under Captain Morey's version of events, Captain Lusk did not violate the Radiotelephone Act. The Act requires radio communication necessary for safe navigation. *See* 33 C.F.R. § 26.04. The evidence is undisputed that Captain Lusk and Captain Morey were in continuous radio contact throughout the docking procedure. Navigational safety was certainly not compromised by Captain Lusk's failure to notify Captain Morey of the origin of the discharge from the M/V SAUDI DIRIYAH. Even assuming, *arguendo*, that Captain Lusk's failure to so notify Captain Morey constituted a violation of the Act, this violation clearly did not cause the collision because it occurred *after* the collision. NSCSA's argument on this point, therefore, is bordering on frivolous.

■ Although Moran violated no federal navigational standard, it may still be liable to NSCSA due to the negligence of Captain Lusk. After being instructed by Captain Morey to land his tug on the port quarter of the M/V SAUDI DIRIYAH, Captain Lusk closed in for his landing. He intended to place the starboard shoulder of his tug against the vessel. Instead, the stern of the tug moved toward the ship in the last few seconds before the shoulder landed. Captain Lusk was unable to explain why his tug landed stern-first. When the stern of the HARRIET MORAN made contact with the port quarter of the M/V SAUDI DIRIYAH, the starboard quarter bitt of the HARRIET MORAN punctured the fuel oil settling tank of the M/V SAUDI DIRIYAH and caused oil to spill out of the vessel.

If Captain Lusk had maneuvered his tug with more caution, he could have landed his tug as he intended, shoulder first, and the oil

spill would not have happened. His failure to properly control his vessel constitutes a lack of due care; and, therefore, is negligence under maritime law. *See Benedict on Admiralty, supra* at 28, § 3.02[B][4]. Captain Lusk's negligence was the proximate cause of the collision between the HARRIET MORAN and the M/V SAUDI DIRIYAH and the proximate cause of the resulting oil spill.

In its answer and counterclaim, Moran asserts that the collision between the HARRIET MORAN and the M/V SAUDI DIRIYAH was caused by the negligence of Captains Grech and Morey. Moran maintains that either Captain Grech or Captain Morey should have advised Captain Lusk to land his vessel forward from the flared portion of the M/V SAUDI DIRIYAH. Moran also claims that Captain Grech should have advised the tug captain of the location of the fuel oil settling tank, so that he could have avoided that section of the ship. Finally, Moran argues that NSCSA should have painted a sign on the side of the M/V SAUDI DIRIYAH such as "Tugs Here," indicating where tugs should land on the vessel.

■ From the evidence presented at trial, it is apparent that NSCSA was not negligent during the undocking maneuver. At trial, Captain Morey was asked why he did not tell Captain Lusk where to land on the M/V SAUDI DIRIYAH. He responded:

A Because he understands where he needs to land the tugboat. He is a professional tugboat man. I don't tell him everything to do. I just tell him the general area of where I want him, and they can decide for themselves whether they can get there or not.

Q Is it customary to tell a tugboat captain exactly where to go when you tell them port quarter?

A Not usually, no.

(Morey, tr. 53). Captain Morey had worked with Captain Lusk many times before. He knew Captain Lusk to be an experienced, competent tug pilot. With this knowledge, Captain Morey reasonably assumed that Captain Lusk would place his tug in the proper location. Under these circumstances,

Captain Morey was under no duty to instruct Captain Lusk on the proper placement of his tug. Captain Grech reasonably relied upon Captain Morey in this regard.

■ As for the fuel oil settling tank, it was perfectly understandable for Captain Grech to assume that a tug operator would not rupture the hull of his vessel. He is not required under the law to advise every tug pilot about sensitive portions of his vessel. Furthermore, Captain Lusk is an experienced tug pilot, who has assisted with undocking maneuvers on numerous occasions, including maneuvers involving the M/V SAUDI DIRIYAH and her sister ships. Captain Lusk was aware of the flared hull design of the M/V SAUDI DIRIYAH, and he realized that he should not land his tug so far aft that her stern might make first contact with vessel. Warning instructions from the bridge would not have told him anything which he did not already know.

■ Moran's claim that NSCSA was negligent because it did not place a "Tugs Here" sign on the side of the M/V SAUDI DIRIYAH must also fail. From the evidence at trial, it appears that some vessels have signs on their sides indicating where a tug should or should not land. The evidence also showed that the vast majority of vessels do not have a sign of this type. Although placing such a warning on the side of the M/V SAUDI DIRIYAH may have been a good idea, no industry standard to this effect exists and NSCSA's failure to place a warning sign does not constitute a lack of due care. A shipowner is not required under the law to take every precaution imaginable to avoid an accident, it simply must exercise reasonable care, and a shipowner may certainly rely upon the expertise of a tug captain in docking and undocking maneuvers. NSCSA acted reasonably in this case.

### C. DAMAGES

#### 1. OPA Damages

■ Because the collision between the HARRIET MORAN and the M/V SAUDI DIRIYAH was caused solely by the negligence of Moran's agent, Captain Lusk, in performing the undocking maneuver, NSCSA is entitled to recover from Moran, under OPA's contribution provision, the money it spent cleaning up the resulting oil spill and the money it spent compensating victims of the spill. NSCSA proved that it incurred $868,356.80 in removal expenses. In addition, the USCG and the United States Navy have outstanding claims, for approximately $300,000, for their role in the cleanup. Finally, NSCSA spent $106,806.12 to compensate victims of the oil spill. See discussion supra § I(C). Not including the sums owned to the USCG and the United States Navy, which are not liquidated at this time, NSCSA has proved a total of $975,162.92 in removal and compensation expenses.

Under section 2704 of OPA, however, Moran's liability in this case is limited to $500,000, unless one of the exceptions contained in the act applies. 33 U.S.C. § 2704; see supra § II(A). Moran's liability is not limited under OPA, if the oil spill was proximately caused by gross negligence, willful misconduct, or the violation of a federal regulation. 33 U.S.C. § 2704(c). In this case, no evidence was presented suggesting that the collision was caused by gross negligence or willful misconduct. This is simply a case of ordinary negligence, a failure to exercise reasonable care. NSCSA argues that the collision was caused by Moran's violation of the proper lookout statute, 33 U.S.C. § 2005, and the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. §§ 1201–1208; 33 C.F.R. § 26.04. As discussed above, Moran did not violate either of these statutes, and, even if it did violate the Radiotelephone Act, that violation did not cause the collision. See supra § II(B). None of the exceptions to liability under section 2704(c) apply in this case; therefore, Moran's liability under OPA is limited to $500,000.

#### 2. Collision Damages

■ In addition to the damages NSCSA may recover under OPA, NSCSA is also entitled to recover the damages it directly incurred as a result of the collision under general maritime law.[11] OPA does not regu-

---

11. NSCSA claims it is also entitled to recover its

collision damages under the Virginia State Water

late recovery of these types of damages. *See* 33 U.S.C. § 2751 ("Except as otherwise provided in this chapter, this chapter does not affect ... admiralty and maritime law."). The collision between the HARRIET MORAN and the M/V SAUDI DIRIYAH falls within the admiralty jurisdiction of this Court, 28 U.S.C. § 1333; therefore, the rights between the parties, with regard to direct collision damages, must be determined in accordance with the general maritime law. *See East River S.S. Corp.*, 476 U.S. at 864, 106 S.Ct. at 2298–99.

The collision was caused solely by the negligence of Captain Lusk. *See* discussion *supra* § II(B). Under its admiralty claim, therefore, NSCSA is entitled to recover the full amount of the damages it incurred as a direct result of the collision. At trial, NSCSA proved that it lost $3,250 in fuel oil and spent $16,050 to repair the hull of the M/V SAUDI DIRIYAH. NSCSA did not prove any economic damages. NSCSA may, therefore, recover $19,300 from Moran under its admiralty claim.

### 3. Prejudgment Interest

■ In addition to an award of compensatory damages, NSCSA is entitled to prejudgment interest. NSCSA urges the Court to apply the prejudgment interest provisions contained in OPA. Under section 2705, a "responsible party ... is liable to a claimant for interest on the amount paid in satisfaction of a claim under this chapter." 33 U.S.C. § 2705(a). The period for which interest is measured begins when the claimant presents his claim to the responsible party and ends on the date the claim is paid. 33 U.S.C. § 2705(b)(1). Interest is "calculated at the average of the highest rate for commercial and finance company paper of matu-

rities of 180 days or less obtaining on each of the days included within the period for which interest must be paid to the claimant, as published in the Federal Reserve Bulletin." 33 U.S.C. § 2705(b)(4). Section 2705, however, is not applicable to this case. By its terms, section 2705 only applies to cases under OPA brought by a claimant against a responsible party. 33 U.S.C. § 2705(a). It does not apply to actions under OPA's contribution provision brought by a responsible party. Because OPA does not define the amount of prejudgment interest recoverable in this contribution action, the Court will look to general maritime law.

■ "Throughout our history, admiralty decrees have included provisions for prejudgment interest." *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* —— U.S. ——, ——, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995). Because an injured party is to be completely compensated for its loss, the general rule in maritime collision cases is that prejudgment interest should be awarded. *Id.* Only when a case presents "peculiar" or "exceptional" circumstances will an award for prejudgment interest be denied. *Id.* —— U.S. at ——, 115 S.Ct. at 2095–97 (holding that neither a good faith argument as to liability nor the mutual fault of the plaintiff and the defendant justifies denial of prejudgment interest). No peculiar or exceptional circumstances arose in this matter; therefore, NSCSA is entitled to prejudgment interest on its award.

■ In admiralty cases, computation of an award for prejudgment interest is within the sound discretion of the district court. *Ameejee Valleejee and Sons v. M/V Victoria U.,* 661 F.2d 310, 313 (4th Cir.1981). Thus, the district courts are not bound by the maximum rate of prejudgment interest allow-

---

Control Law, Va.Code Ann. § 62.1–44.34:18(C)(4). Under that law, any person who causes the discharge of oil into state waters is liable to "(a)ny person for injury or damage to person or property ... caused by such discharge." *Id.* NSCSA argues that it should be allowed to recover for damage to its vessel and for the oil it lost in the spill, because these damages resulted from the discharge of oil from the M/V SAUDI DIRIYAH, which Moran caused. Clearly, the damage to the vessel itself was not caused by the discharge of oil. In fact, the

damage occurred before the discharge. NSCSA, therefore, may not recover for the damage to its vessel under the state statute. It is also clear that NSCSA may not recover for its lost oil under the Virginia statute. Strictly speaking, NSCSA's loss of oil resulted from the discharge of oil caused by Moran; however, it was NSCSA's oil. The Virginia law was meant to provide a remedy for those damaged by oil. It was not meant to provide a remedy for those whose oil damaged others. Such an odd application of the statute, as urged by NSCSA, cannot be allowed.

able under state law. *Id.* Instead, the district courts have been urged to follow the prevailing commercial interest rates, when determining an appropriate award. *Id.* at 314.

In accordance with these principles, the Court finds that NSCSA is entitled to recover from Moran interest on $519,300,[12] at a rate of 8.25%,[13] from March 17, 1995, the date NSCSA served its complaint, to date of judgment entry.

### D. MORAN'S COUNTERCLAIM

Moran Towing of Virginia filed a counterclaim against NSCSA on April 10, 1995, alleging that the collision between the HARRIET MORAN and the M/V SAUDI DIRIYAH and the resulting oil spill were caused by the negligence of NSCSA. Moran bases its claim on contribution and indemnification theories. As stated above, the collision was caused solely by the negligence of Moran. *See supra* § II(B). As to Moran's counterclaim, therefore, the Court finds in favor of NSCSA and DIRECTS entry of judgment to this effect.

### E. MORAN'S MOTION FOR SANCTIONS

On November 28, 1995, Moran filed a motion, requesting that the Court sanction NSCSA for failing to deliver the original course recorder tracing, bell book, and automatic bell logger from the M/V SAUDI DIRIYAH. NSCSA did not release these documents as requested by Moran in a request for production of documents. At a hearing

on Moran's Motion to Compel, Magistrate Judge Tommy E. Miller ordered NSCSA to produce the original course recorder tracing by September 25, 1995, or to explain what efforts have been made to recover the tracing. In NSCSA's response to Moran's Motion to Compel, counsel for NSCSA explained that, despite their exhaustive efforts to find the original course recorder tracing, they had been unable to locate the document. NSCSA further stated that no bell book or automatic bell logger exists for the night of December 1, 1993.

After hearing the evidence presented in this case, it is clear to the Court that NSCSA did not violate any rules of discovery. NSCSA presented uncontradicted evidence at trial that Captain Grech made a copy of the original course recorder tracing when the USCG boarded his vessel during the night of the spill; that Captain Grech gave a copy of the tracing to the USCG that night; that counsel for Moran were provided this same copy of the tracing; and that no one at this time is aware of what became of the original tracing. NSCSA, therefore, was unable to produce the original tracing in response to Moran's request.

The evidence also revealed that the automatic bell logger of the M/V SAUDI DIRIYAH was not operational on the night of the spill; therefore, no record from that machine would have been responsive to Moran's request. Finally, Captain Grech testified that no handwritten bell book was kept by the crew that night. One crew member, Tariqu Mohammed Osman, testified that typically when the automatic bell logger is not opera-

---

**12.** NSCSA argues that it should be awarded prejudgment interest on the full amount of its damages, rather than on the reduced amount to which it is entitled under OPA's limitation provision. Because an award of prejudgment interest on the full amount NSCSA's damages would violate the reasoning underlying an award of prejudgment interest, it is not surprising that NSCSA was unable to cite any case in support of its position.

The purpose of prejudgment interest is to fully compensate the victim of a collision. *Cement Div., Nat'l Gypsum Co.,* —— U.S. at ——, 115 S.Ct. at 2095. Due to the time-consuming nature of litigation, it often takes months or even years for an injured person to receive what he is entitled to under the law. Recognizing the time-

value of money, admiralty law allows a plaintiff to recover prejudgment interest on his award. The rationale behind this method of compensation would not apply if the plaintiff were awarded prejudgment interest on the full amount of his damages rather than on the amount to which he is entitled to judgment under the law. Such an award would go beyond compensation, and, instead, provide a windfall.

**13.** Eight and one quarter percent is the current prime rate offered by banks in this area on loans to businesses. The Court finds that this is an appropriate rate at which to compute NSCSA's pre-judgment interest award. *See Ameejee Valleejee and Sons,* 661 F.2d at 314 (urging district courts to assess prejudgment interest at prevailing commercial rates).

tional, a handwritten bell book is kept. He had no specific recollection, however, whether the automatic bell logger was operational on the night of the spill or whether a handwritten bell book was kept that night. Captain Grech was a credible witness, and Moran produced no evidence which would cause the Court to disregard his testimony. The Court, therefore, finds as a fact that no handwritten bell logger exists from the night of the spill. Obviously, therefore, NSCSA could not provide any document in response to Moran's request for the bell book.

Moran's Motion for Sanctions is not supported by any substantial evidence, but, rather, is based on distrust and speculation. Moran's Motion for Sanctions, therefore, is **DENIED.**

### III. CONCLUSION

For the foregoing reasons, the Court DIRECTS the Clerk to enter judgment for Plaintiff against all Defendants in the amount of $519,300 plus costs and interest at a rate of 8.25% from March 17, 1995, until the date of judgment. The Clerk is further DIRECTED to enter judgment in favor of Plaintiff on the counterclaim filed by Moran Towing of Virginia, Inc., and on Defendants' Motion for Sanctions.

It is so ORDERED.