UNOCAL CORPORATION; Union Oil Company of California; and Erst, Inc., Plaintiffs–Appellees–Cross–Appellants,

v.

The UNITED STATES of America, Defendant,

and

The Southern California Regional Rail Authority dba Metrolink; and Kruze & Kruse Construction & Engineering, Inc., Defendants–Appellants–Cross–Appellees.

Nos. 99–55342, 99–55381.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 2000

Filed Aug. 7, 2000

530

Gregory M. Bergman, Alan H. Mittelman, Robert M. Mason III, and Michele M. Goldsmith, Bergman & Wedner, Inc., Los Angeles, California, for the defendants/appellants/cross-appellees.

William H. Collier, Jr., Dawn M. Schock, Joseph A. Walsh II, and John M. Whelan, Keesal, Young & Logan, Long Beach, California, for the plaintiffs/appellees/cross-appellants.

Before: REINHARDT and BERZON, Circuit Judges, and BREYER, District Judge.[1]

1. Honorable Charles R. Breyer, District Judge   for the Northern District of California, sitting

BREYER, District Judge:

This case concerns the cause and aftermath of a 1995 crude oil pipeline spill in Norwalk, California. The spill, which discharged over 45,000 gallons of crude oil, occurred on February 20, 1995 during the construction of the Norwalk–Santa Fe Metrolink railway station. At least 50 gallons of oil escaped through a nearby storm drain and contaminated a local creek and river. The total cost of cleanup was over $4 million.

In the wake of the spill, Union Oil Co. of California ("Unocal"), the owner of the ruptured pipeline, filed suit against Southern California Regional Rail Authority, dba Metrolink ("Metrolink"), for reimbursement of the cleanup costs. After a two-week trial, a jury returned a verdict in favor of Unocal based on negligence, breach of contract and quasi-contract theories, and pursuant to the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701, *et seq.* Metrolink now appeals, contesting the validity of both the jury's verdict and the district court's special verdict form. Unocal has filed a cross-appeal protesting the district court's award of pre-judgment interest, its refusal to award attorney's fees, and its refusal to issue a declaratory judgment.

## BACKGROUND

### I. Events Prior to the Spill

Unocal has operated the Stewart pipeline since 1957. Metrolink is a joint powers authority established pursuant to California Government Code section 6509. In August 1994, Metrolink contracted with Kruze & Kruze ("K & K") to construct a new Metrolink railway station in Norwalk. As the general contractor on the project, K & K subcontracted with defendant ECCO to provide a Caterpillar 973 loader and an operator to perform heavy equipment operations on the site.

The proposed Metrolink site in Norwalk was located directly above a section of the

Stewart pipeline. The site also contained a Los Angeles County Flood Control District storm drain box culvert which ran underground above the pipeline near the western edge of the construction site.

In approximately December 1994, Emery Brown, K & K's superintendent in charge of the Norwalk project, contacted Underground Service Alert ("Dig Alert") for assistance. Dig Alert operates a program which coordinates efforts to prevent damage to underground pipelines during excavation and construction. Dig Alert notified Unocal, and Unocal responded by sending two employees, Richard Alvarez and Ned Voigt, to the construction site to mark the course of the Stewart pipeline with yellow paint. Following maps and overlays, Alvarez and Voigt marked the course of the pipeline.

Voigt also "potholed" in the area of the storm drain. Potholing requires a digger to excavate a site slowly by hand to uncover underground conditions. Voigt's potholing revealed that, in the area surrounding the storm drain, the Stewart pipeline was located approximately seven or eight feet below the ground.

Nothing in the record indicates that anyone working on the project had potholed in the area where the pipeline rupture eventually occurred prior to the accident on February 20, 1995. Accordingly, no one at the site knew that the pipeline was actually less than a foot under the ground in that area.

### II. February 20, 1995: The Spill

On February 20, 1995, Mike Beltran, an ECCO employee, was operating a large Caterpillar on the Norwalk site. At the time, Beltran was working under the direct supervision of Emery Brown. Beltran spent several hours that day excavating the area surrounding the storm drain and piling the excavated dirt along a nearby surface. At about 2:00 p.m., after par-

by designation.

tially completing the excavation, Beltran began to smooth out the excavated dirt in order to create a leveled access road for vehicle traffic.

Beltran passed over the access road three times, lifting several inches of dirt from the surface in the process. During Beltran's fourth pass over the access road, one of the teeth from the front bucket of the Caterpillar punctured the Stewart pipeline, causing a cascade of oil to emerge.

As noted above, an underground storm drain was located on the construction site. A storm drain inlet ("the inlet") was situated in the ground approximately 40 feet from the point of the rupture. The grate-covered inlet connected to the storm drain, which, in turn, opened into Coyote Creek, a nearby waterway. Immediately after the rupture, the local fire department and K & K employees placed a piece of plywood over the inlet and piled dirt around and above the wood in order to divert oil from the area of the drain inlet. The goal of this covering was to contain the spilling oil in a pool in order to prevent it from escaping the immediate premises.

As a result of these efforts, the oil formed a pool to the south of the pipeline with dimensions of approximately 200 feet by 20 feet. A second, less fortunate result of these efforts was that the inlet, which was once readily visible, was now completely covered and obscured from view. Because of this initial berming, no one who arrived on the scene for the next several hours was able to see that oil had spilled into the area of the inlet.

Shortly after the rupture, Unocal representatives arrived at the scene, assumed the role of managing oil spill response, established an incident command, and began cleanup efforts. Among the Unocal representatives first on the scene were Hugh Craddock, Unocal's supervisor of Health, Environment and Safety, and Paul Bauer, Unocal's District Maintenance Foreman. Bauer immediately telephoned Unocal's control center to confirm that the pipeline had been shut down, and then, along with Craddock and district foreman Lamar White, closed a nearby block valve in the pipeline to ensure that oil would not continue to flow into the spill area. However, their initial visual inspections of the site raised no concerns about possible infiltration of oil into the storm drain inlet.

Bauer and Craddock met with fire department personnel, who briefed them on the situation. At that time, the Unocal employees were not told, nor did they ask, about the existence of a storm drain inlet. For the next several hours, Unocal's agents on the scene did not know that the pool of oil that had formed from the spill was located above the storm drain, nor that a storm drain inlet was located 40 feet from the site and had been sealed off by K & K personnel. Craddock and his assistants did not speak with Voigt or Alvarez about the site, nor did they consult maps, overlays, or as-built plans which might have informed them of the location of the drain until approximately six hours after their arrival.

At Craddock's instruction, Bill Orr, Unocal's Torrance district operations foreman, placed a telephone call to the state water resources control board and the Los Angeles County Flood Control District ("LACFCD"). Orr placed the calls at approximately 6:30 that evening. Orr told Charlie Sherman, the County Department of Public Works' superintendent of construction, that an oil spill had occurred but that no oil had reached the storm drain and that no waterways had been affected by the spill. Sherman and his team were the only local officials legally authorized to enter the storm drain to check for oil. Because Orr told him that the call was merely a courtesy, Sherman did not visit the site of the spill at all that night.

After consulting several maps that evening, Craddock realized that the oil pool was situated directly above the storm drain. This discovery caused Craddock concern for two reasons. First, he wor-

ried that, depending on the exact location of the drain, it might be damaged during the excavation of soil that was planned for the following morning. Second, he recognized that the drain's concrete walls might contain fissures that could cause small leaks. At approximately 9:00 that night, Craddock placed another telephone call to LACFCD, informing Charlie Sherman that there was a storm drain in the area and asking him to visit the site the next morning to monitor the planned excavation.

## III. After the Spill

Following the spill, some portion of the oil from the pipeline traveled through the storm drain into the north channel of nearby Coyote Creek. The oil followed Coyote Creek into the San Gabriel River, and then traveled south along the river. Early in the morning on February 21, 1995, oil was discovered in both Coyote Creek and the San Gabriel River.

Upon learning that oil had reached the waterways, the crew from LACFCD checked the storm drain for the first time since the spill. After entering the drain, the crew discovered that oil had penetrated the drain by way of the inlet that had been covered by K & K immediately following the spill. At approximately 8:00 that morning, Unocal placed booms at the storm drain outflow to prevent further contamination of the water. Later that day, ERST, Inc. ("ERST"), a Unocal subsidiary, assumed the chief role in managing the cleanup effort. On the same day, Metrolink's manager of construction, Lloyd Suehiro, represented to ERST that Metrolink would pay the costs of removing the spilled oil.

Over the course of the next several months, Unocal coordinated an effort to clean up the spilled oil. Agents of Metrolink, meanwhile, assembled a "unified command" team and developed a system for the submission of invoices from the cleanup efforts. The total cost of the cleanup was $4.66 million. Approximately $2.4 million of that total was spent cleaning up oil

that had escaped into the waterways by way of the storm drain.

## IV. Procedural History

On September 15, 1995, Unocal submitted a formal claim to Metrolink for reimbursement of the cleanup costs, pursuant to Cal. Govt.Code § 915. Metrolink rejected the claim on October 10, 1995.

On March 8, 1996, Unocal presented a written claim to the National Pollution Funds Center ("NPFC"), the governmental entity that administers the federal Oil Spill Liability Trust Fund ("the Fund") established under the Oil Pollution Act. The Fund provides monies for the reimbursement of oil spill cleanup costs. On June 12, 1996, NPFC denied Unocal's request. Unocal sought reconsideration of NPFC's decision, but that request was denied on October 9, 1996.

On January 2, 1997, plaintiffs Unocal and ERST filed a complaint seeking damages and declaratory relief against Metrolink, K & K and ECCO, among others. The complaint stated eight causes of action against Metrolink: (1) negligence; (2) indemnity; (3) apportionment of fault; (4) indebitatus assumpsit; (5) quantum meruit; (6) breach of oral contract; (7) recovery of removal costs pursuant to the OPA, 33 U.S.C. § 2702; and (8) declaratory relief. The complaint also sought judicial review, pursuant to 5 U.S.C. § 702, of NPFC's refusal to fund the cleanup effort, but Unocal agreed to stay that cause of action pending resolution of the claims against the other defendants.

Following a two-week trial, the jury returned a verdict in favor of Unocal on August 14, 1998. The jury awarded Unocal $4,653,851.02, finding that Metrolink was liable for 80% of the damage and K & K was liable for the remaining 20%. The jury found that (1) Metrolink and K & K had been negligent and had been the sole cause of the spill, (2) Unocal had exercised due care and taken precautions against foreseeable risks, and (3) Metrolink had

breached its agreement to reimburse Unocal for the costs of the cleanup.

Following the trial, the parties submitted a number of motions. On November 23, 1998, Metrolink moved for judgment after trial pursuant to Fed.R.Civ.P. 50(b) on Unocal's oral contract and OPA claims. Metrolink also moved for a new trial pursuant to Fed.R.Civ.P. 59(a) on the negligence, contract, OPA, quantum meruit and indebitatus assumpsit claims. The district court denied each of these motions by written order on December 21, 1998. Judgment was entered on February 1, 1999.

Unocal also made several post-trial motions. On October 5, 1998, Unocal moved for an award of prejudgment interest under the OPA, an award of attorney's fees and a declaration formally identifying Metrolink and K & K as "responsible parties" under the OPA. By written order dated November 9, 1998, the district court granted Unocal's motion for pre-trial interest at a rate of 5.87% per annum, and denied its requests for attorney's fees and declaratory relief.

On January 19, 1999, Metrolink and K & K filed this appeal challenging all of the district court's adverse orders in the case. This appeal challenges the validity of the jury's findings of negligence, OPA, contractual and quasi-contractual liability.

On January 29, 1999, Unocal filed its cross-appeal challenging the district court's November 9, 1998 order. The cross-appeal challenges the district court's decision to award pre-judgment interest at a rate of 5.87%, to deny attorney's fees and to deny Unocal's request for a declaratory judgment.

## DISCUSSION

### I. Metrolink's Claims on Appeal

As noted above, the jury in this matter concluded that, pursuant to the provisions of the OPA, Metrolink was 80% liable and K & K was 20% liable for the damage caused by the spill. The jury concluded that Unocal and ERST were not liable to any degree. In this appeal, Metrolink challenges the jury's findings, arguing that they are not supported by the evidence in the record. According to Metrolink, even if the agency and its contractor were partially at fault for the spill, Unocal was also at least partially responsible.

■ We review the district court's denial of Metrolink's Rule 50(b) motion for judgment *de novo* to determine whether the jury's verdict was supported by substantial evidence. *See Erickson v. Pierce County*, 960 F.2d 801, 804 (9th Cir.), *cert. denied*, 506 U.S. 1035, 113 S.Ct. 815, 121 L.Ed.2d 687 (1992). We review for abuse of discretion the district court's denial of Metrolink's motion for a new trial. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1325 (9th Cir.1995).

### A. The OPA's Legal Standard

The standards of liability in this case are governed by the OPA, 33 U.S.C. § 2701, *et seq.* Under the OPA, anyone owning or operating a pipeline is held strictly liable for any removal costs and damages caused by a discharge of oil from that pipeline. 33 U.S.C. § 2702(a). The owner/operator, designated under the OPA as the "responsible party," may state a complete defense to liability if it can establish, by a preponderance of the evidence, that (1) the discharge was caused solely by the act or omission of a third party; (2) the responsible party exercised due care with respect to the pipeline; and (3) the responsible party took precautions against foreseeable acts or omissions of third parties and the foreseeable consequences of those acts or omissions. 33 U.S.C. § 2703(a)(3). Once the responsible party establishes these three factors, the third party who caused the spill officially becomes a "responsible party," and the owner/operator no longer bears any liability for the spill. 33 U.S.C. § 2702(d)(1)(A). *See also Reliance Ins. Co. v. United States*, 230 Ct.Cl. 390, 677 F.2d 844 (Ct.Cl.1982); *Cities Service Pipe Line Co. v. United States*, 4 Cl.Ct. 207

(1983) (interpreting "sole cause" requirement in OPA predecessor statute).

■ Unocal argues that it cannot be held liable for failing to contain the oil spill because the OPA draws a distinction between antecedent causes of an oil spill and acts taken to contain the spill once it has begun. According to Unocal, if an owner/operator establishes that a third party is responsible for causing a spill in the first instance, then the owner/operator cannot be held liable for any of the damage caused by the spill, even if the owner/operator is negligent in its efforts to contain or clean the discharged oil. This proposition finds no support in either the language or the policy of the OPA.

The OPA does not contain any explicit temporal definition of "cause" which distinguishes antecedent causes of a spill from the failure to contain a spill once it occurs. Unocal, however, points out that the OPA defines "removal costs" by reference to the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1321(c). Section 1321(c)(4) of the FWPCA states that persons other than "responsible parties" are not liable for costs or damages incurred in the course of rendering care or assistance in a spill situation, as long as they act in a manner consistent with the National Contingency Plan. Unocal argues that this provision of the FWPCA protects it from liability for any negligence in the wake of the spill. We disagree.

Under the OPA, Unocal, as a pipeline owner/operator, is a "responsible party," and therefore is not relieved of its obligations by the insulating provisions of section 1321(c). *See* 33 U.S.C. § 2701(32). Unocal argues that it was replaced as the responsible party by Metrolink as soon as the spill occurred, and was therefore relieved of that status for the purposes of cleanup. Accordingly, Unocal asserts, as a non-responsible party, it deserves the protection of section 1321(c). This argument is circular: Unocal is attempting to argue that it is not a "responsible party" for the purposes of cleanup merely by stating that

its responsibilities ended when the spill first occurred. Unocal's only support for this proposition is section 1321(c), the very provision which it purports to interpret. We cannot credit such reasoning. According to our reading of the statute, Unocal remained a "responsible party" throughout the period of the spill and attempted containment. The OPA does not support the contrary conclusion.

Moreover, even if Unocal is correct that its "responsible party" status ended as soon as the spill began, Unocal still falls outside the ambit of section 1321. That provision explicitly states that "[n]othing in this subsection affects ... (A) the *obligation of an owner or operator to respond immediately to a discharge,* ... or (B) the liability of a responsible party under the Oil Pollution Act of 1990." 33 U.S.C. § 1321(c)(5) (emphasis added). Therefore, even assuming that the owner/operator of the pipeline is no longer a "responsible party" under the OPA once the spill has begun, it remains obligated to respond to the discharge.

■ Finally, Unocal's argument that it should be relieved of responsibility for containment flies in the face of the goals of the OPA. "The purpose of OPA, as well as other remedial legislation passed by Congress and the states to address environmental disasters such as oil spills, was to encourage rapid private party responses." *Matter of Metlife Capital Corp.,* 132 F.3d 818, 822 (1st Cir.1997) (quoting *In re Jahre Spray II K/S,* 1996 WL 451315, *4 (D.N.J.1996)). Unocal's theory essentially excuses owners and operators of oil pipelines and other vessels from participating in the cleanup of spills of their own oil, and exempts from liability those owner/operators who are foolish enough to join the cleanup efforts. We reject Unocal's argument.

In conclusion, Unocal was *not* relieved of its duties immediately upon the occurrence of the spill. Rather, Unocal bore the burden at trial of establishing the

three elements described above. Specifically, in order to establish Metrolink's liability, Unocal was required to show that Metrolink or other third parties were the sole cause of the spill and its consequences, that Unocal exercised due care (prior to the spill and during its containment), and that Unocal took necessary precautions to prevent foreseeable harm. The jury in this case found that Unocal had proven each of these requirements. As we explain below, we conclude that Unocal presented substantial evidence at trial to meet these burdens, and that the jury's verdict should stand.

### B. Unocal's Purported Negligence

■ Metrolink argues that Unocal failed to establish at trial that Metrolink and K & K were not the sole causes of the oil spill, that Unocal exercised due care, or that Unocal took necessary precautions to avoid the spill and its consequences. Specifically, Metrolink points out five ways in which Unocal allegedly helped to cause the spill and failed to exercise due care. We address each of these points separately.

### 1. Failure to Foresee the Possibility of a Rupture

First, Metrolink asserts that Unocal's actions prior to February 20 played a causal role in creating the spill. In its briefs before this court, Metrolink implies that Unocal's lineriders, Voigt and Alvarez, misled K & K regarding the depth of the pipeline. Had Voigt and Alvarez taken exact measurements of the pipeline's depth, or had they not made any representations at all about the depth, Metrolink argues, the spill might have been avoided.

■ This argument ignores the fact that Unocal's affirmative legal obligation was not to measure the depth of the pipeline. See CAL. GOV'T CODE § 4216 et seq. Under California law, the party that is planning to excavate, grade or scrape a piece of land-K & K in this case-has the duty of determining the "exact location" of the pipeline in the ground. CAL. GOV'T CODE

§ 4216.4. Therefore, Metrolink's attempt to blame Unocal for failing to determine the exact depth of the pipeline prior to the spill is misplaced.

Moreover, Metrolink and K & K never informed Unocal that they planned to excavate in the area of the storm drain or the area where the rupture occurred. The jury could have reasonably concluded that Unocal could not foresee that any excavation would occur in that area. Therefore, even if Unocal should have measured the depth of the pipeline at various points, it would have had no particular reason to measure the depth in the area surrounding the storm drain, where Beltran's Caterpillar punctured the pipe.

Metrolink next argues that, even if Unocal was not legally responsible for determining the depth of the pipeline, Unocal's lineriders misled K & K about its depth prior to the spill. Metrolink relies on the testimony of Emery Brown to establish that Voigt and Alvarez misled K & K to believe that the pipeline was located deeper in the ground than it actually was. According to Brown, Alvarez used a machine to measure the depth of the pipeline and reported to him that the pipeline was located at least three feet under the ground. Alvarez, however, testified that he did not know the depth of the pipeline. Voigt also testified at trial that he knew nothing about the depth of the pipeline, other than the depth around the storm drain, and that he gave no additional information to Brown or any other contractor. Interpreting this conflicting testimony in the light most favorable to Unocal, we will not disturb the jury's finding that Unocal played no role in causing the spill.

### 2. Debriefing upon Unocal's Arrival at the Site

Metrolink next argues that the failure of Unocal employees to obtain a full briefing upon their arrival at the site constituted a lack of due care, and that this failure led

inevitably to the escape of oil into the waterways.

As noted above, the first Unocal representatives on the scene were Hugh Craddock, Paul Bauer and Lamar White. Metrolink points out that, while Bauer and Craddock were briefed by fire department personnel at the scene, they never inquired about the existence of a storm drain inlet. Further, no members of the Unocal team contacted Voigt or Alvarez, both of whom were familiar with the site, the pipeline, and the storm drain. As a result of this failure to receive a full briefing, Metrolink argues, the Unocal team remained uninformed about the existence and location of the storm drain and the drain inlet for several crucial hours.

We do not find this argument convincing. Upon his arrival at the scene an hour after the spill, Craddock was told by fire department officials that the oil had been fully contained. Chief Ashby, the fire department's incident commander, had no reason to suspect that any oil had entered the drain, so he did not raise the issue during this initial briefing. Nor is Chief Ashby's ignorance surprising, because K & K employees had incorrectly informed the fire department about 40 minutes earlier that no oil had entered the inlet. By the time Craddock and Bauer arrived at the scene, the inlet was covered by the earthen berm, so the Unocal employees did not notice it and had no obvious reason to ask about it.

While the initial briefing might have been more detailed, the blame should not necessarily fall on Unocal's shoulders. The jury concluded that it should not, and that verdict is supported by the evidence.

### 3. Assessment and Inspection of the Site

Metrolink next argues that Unocal was negligent in its initial assessment and inspection of the spill site. According to Craddock's testimony, the initial assessment of a spill site should include investigation of potential outflows and escaping pollutants. Ensuring containment of the oil at the Norwalk site was the responsibility of the incident commander, a position occupied at times by both Craddock and Lamar White. Metrolink argues that Craddock failed to fully inspect the site, and that if he had properly assessed the situation upon his arrival, he would have immediately inspected the storm drain. If Craddock had inspected the storm drain, he would have discovered that spilled oil had penetrated the drain, and Unocal would have placed booms at the drain outflow to prevent the contamination of the surrounding waterways. However, neither Craddock nor any other Unocal officials inspected the drain or sent any lineriders to investigate the waterways for oil during the first several hours following the spill.

Metrolink also points out that, soon after his arrival, Bauer noticed a manhole located near the oil pool. At the time, Bauer assumed that the manhole led to an underground storm drain, but concluded that oil could not have reached the drain because the manhole was located on high ground some distance from the location of the spill. Metrolink argues that when Bauer first noticed the manhole, he should have recognized the danger that oil had somehow reached the storm drain, perhaps by seeping through the soil.

With the benefit of hindsight, Metrolink is certainly correct that Unocal's agents would have been wise to inspect the drain. However, this does not necessarily compel the conclusion that Craddock and Bauer failed to exercise due care. They performed a visual assessment of the site, noticed that the flow of oil had almost completely ceased, and saw no avenue of escape for the oil. Further, as discussed above, Craddock and Bauer were informed by the fire department that the oil had been fully contained, and they could not see the now-covered drain inlet. The jury could have concluded that, under the circumstances, this assessment was adequate.

Metrolink argues that, once the Unocal agents recognized the existence of a storm drain, they should have become concerned that oil was seeping into the drain through the soil or leaking through manholes. This argument is not sufficient to overturn the jury verdict. We cannot conclude that Unocal employees were negligent in their failure to recognize a hypothetical risk that never came to fruition. Nothing in the record indicates that the spilled oil penetrated the drain by seeping through the soil or by infiltrating a manhole. While an incorrect suspicion of seepage might have led Unocal to inspect the drain and discover the oil, we are reluctant to hold that the failure to reach this erroneous conclusion necessarily constituted a failure to exercise due care.

Metrolink next argues that the failed containment effort can be attributed to the negligence of Valerie Uyeda and Tom Henning, two ERST employees at the scene. On the day of the spill, Uyeda and Henning were dispatched to Norwalk to provide "operations" and "environmental" assistance. After arriving at the scene, Uyeda and Henning reported to their supervisor that the oil had been contained. Metrolink argues that the ERST employees should have recognized the danger of contamination. Specifically, Metrolink points out that ERST's Standard Operating Procedures Manual mandates that, when performing environmental assessments, ERST personnel should obtain briefings from local operation workers and review relevant maps and charts. Metrolink argues that Uyeda should have—but failed to—follow the manual's procedures.

Contrary to Metrolink's assertions, however, Uyeda's actions were not necessarily negligent. According to the testimony of Tim Perkins, the leader of ERST's emergency response strike team, neither of the two ERST employees on the scene was an "environmental person." Therefore, neither Uyeda nor Henning was bound to follow the section of the ERST manual on which Metrolink relies to create the standard of care. Consequently, substantial evidence supports the jury's finding that Unocal and ERST exercised due care in assessing the site.

### 4. Consideration of Maps and Overlays

Metrolink next argues that both Craddock and Voigt negligently failed to consider the maps and as-built overlays which they had in their possession. Additionally, Metrolink points out, neither Craddock nor Voigt ever provided any of their maps to the fire department personnel for their observation. Craddock himself did not review the overlay map or as-built plans until approximately six hours after his arrival on the scene. Metrolink asserts that, had the Unocal team considered the appropriate maps immediately upon their arrival, they would have discovered that the oil pool was situated directly above the storm drain, and that the storm drain led into Coyote Creek.

Metrolink's criticism notwithstanding, the jury could reasonably have concluded that Voigt and Craddock's behavior was appropriate. Craddock testified that a D4A map typically explains the location of a pipeline, and that he did not check the map because he already knew where the pipeline was located in this instance. Further, knowing the existence and location of the storm drain would not necessarily have caused Unocal to inspect the drain. In fact, as explained above, even though Craddock did eventually inspect the maps at 8:00 that evening, his new knowledge did not sound many alarms, and no one actually checked the contents of the drain until the next morning.

Most importantly, none of the maps in Craddock's possession at the time of the incident contained the one piece of information that would almost surely have set off warning bells in the Unocal camp: the existence and location of the storm drain inlet. Had the maps provided information about the inlet, then Craddock's failure to consider them might have been more crucial. In the absence of that information,

however, the failure to inspect the maps did not necessarily *cause* the expansion of the spilled oil, nor can we conclude that Unocal failed to exercise due care.

### 5. Reporting to Agencies

Finally, Metrolink argues that Unocal failed to report the spill properly to the appropriate agencies, and that proper reporting might have led to the early detection of oil in the storm drain. As explained above, Orr telephoned LACFCD approximately four hours after the spill and reported that no waterways had been affected by the incident. During their conversation, Orr told Charlie Sherman that the call was merely a "courtesy." When he became concerned that the storm drain might be damaged during excavation, Craddock placed a second call to Charlie Sherman. Even after his conversation with Craddock, Sherman felt comfortable that the spill had been contained and had no suspicion that any oil had entered the storm drain.

Sherman testified at trial that he would have immediately traveled to the site if he had been informed that oil had entered the storm drain. Had he discovered oil in the drain, Sherman would have placed booms and sandbags at the outflow to prevent contamination of the waterways. Metrolink argues that Unocal's negligence in relaying information to LACFCD caused Sherman's laxity, thereby preventing the containment of the oil in the storm drain.

We reject Metrolink's argument. At best, Unocal's inaccurate or incomplete reporting to LACFCD was a consequence of the fact that Unocal had not discovered the inlet or considered that oil may have reached the drain. However, as discussed above, the jury's decision that Unocal had not been negligent in its earlier ignorance was supported by substantial evidence in the record. Orr and Craddock's calls, if anything, establish that Unocal was diligent in pursuing the cleanup. The jury's verdict is not undermined by this evidence.

### C. Conclusion

We conclude that the jury's verdict was supported by the evidence. There is substantial evidence in the record to show that (1) the discharge was caused solely by the acts or omissions of Metrolink and K & K; (2) Unocal exercised due care with respect to the pipeline; and (3) Unocal took precautions against foreseeable acts or omissions of third parties and their consequences. Accordingly, the district court's denial of Metrolink's motion for judgment and motion for a new trial is hereby affirmed.[2]

## II. Unocal's Cross–Appeal

In addition to Metrolink's appeal of the jury verdict, Unocal has cross-appealed to protest three of the district court's post-trial decisions. We address these three arguments in turn.

### A. Pre-judgment Interest

First, Unocal appeals the district court's award of prejudgment interest at a rate of 5.87%. According to Unocal, the appropriate rate of prejudgment interest is 12%. In response, Metrolink argues that *no* award of prejudgment interest was appropriate. These arguments are most easily addressed in reverse order.

> Metrolink conceded at oral argument that, if Unocal prevails under any theory, it is entitled to the entire $4.6 million judgment. Accordingly, because we are affirming the district court's decision on Unocal's OPA claims, we need not reach the contract and quasi-contract issues addressed by the parties. For the same reason, we need not address whether the jury's finding of common law negligence was supported by the record.

**2.** In addition to finding a violation of the OPA, the jury found Metrolink liable on common law negligence, contract and quasi-contract theories. In this appeal, Metrolink argues that the jury's verdict on the contract and quasi-contract theories was not supported by substantial evidence. Metrolink also asserts that the district court erred by providing the jury with an overly broad verdict form.

### 1. Is An Award of Pre–Judgment Interest Appropriate Under the OPA?

Metrolink asserts that the district court had *no* discretion to grant prejudgment interest, because the OPA does not allow for such an award in cases like this.[3] Section 2705(a) sets forth the OPA's general rule regarding interest:

> The responsible party ... is liable to a claimant for interest on the amount paid in satisfaction of a claim under this chapter. ... The responsible party shall establish a procedure for the payment or settlement of claims for interim, short-term damages.

33 U.S.C. § 2705(a). By its terms, the OPA permits prejudgment interest only when a "claimant" successfully pursues a claim against a "responsible party." Metrolink argues that Unocal has no right to such interest because it is not a "claimant." On the contrary, Metrolink argues, Unocal remains a "responsible party" in spite of the jury's verdict.

Metrolink argues that, although the verdict determined the liability of Metrolink and K & K, the OPA clearly states that an owner or operator of a pipeline is a "responsible party." Nothing in the statute indicates that the owner/operator's status as a "responsible party" is somehow lifted upon a jury's finding that it was not the cause of an oil spill. For this reason, Unocal-along with Metrolink and K & K-

remains one of three "responsible parties" in this case.

Assuming *arguendo* that Metrolink is correct that Unocal's status as a "responsible party" never terminates, Metrolink's argument still fails. Metrolink asserts that, as a "responsible party," Unocal cannot be considered a "claimant" for the purposes of the OPA's prejudgment interest provision. This assertion directly contradicts the language of the statute itself. As defined in the OPA, the terms "responsible party" and "claimant" are not mutually exclusive. The OPA defines a "claimant" as someone "who presents a claim for compensation under this subchapter." 33 U.S.C. § 2701(4). Section 2708(a) of the OPA explicitly states that "the responsible party for a vessel or facility from which oil is discharged ... may assert a claim for removal costs and damages" if it establishes a complete defense to liability. 33 U.S.C. § 2708(a). Viewing these two statutory provisions in concert, one must conclude that a "responsible party" who has asserted a complete defense can be considered a "claimant" under the OPA.

Therefore, Unocal may be treated as a claimant in this case. As discussed above, Metrolink and K & K are considered "responsible parties" under the statute. *See* 33 U.S.C. § 2702(d)(1)(A). Accordingly, the district court's award of prejudgment interest at a rate of 5.87% was proper under 33 U.S.C. § 2705(a).[4] We reject Metrolink's argument to the contrary.[5]

---

3. Metrolink argues that Unocal is not entitled to pre-judgment interest only in response to Unocal's argument in its cross-appeal that it was entitled to a higher pre-judgment interest rate than the 5.87% awarded by the district court. Thus, even if Metrolink prevailed in this argument, the result would only be to affirm the interest rate the district court awarded, not to reverse the award of pre-judgment interest. *See El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999) (party who fails to appeal issue "may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary") (internal citations omitted).

4. The parties agree that 5.87% is the appropriate rate of interest under the OPA.

5. Metrolink's reliance on *National Shipping Co. of Saudi Arabia v. Moran Mid–Atlantic Corp.*, 924 F.Supp. 1436 (E.D.Va.1996), is misplaced. In *National Shipping*, the plaintiff's boat collided with the defendant's, causing an oil spill. After the cleanup, the plaintiff, a responsible party under the OPA, sued the defendant for contribution. The district court concluded that the defendant was not a "responsible party" under the OPA because it had been acting under a contractual relationship with the plaintiff. *Id.* at 1446 n. 4. As noted above, prejudgment interest is only ap-

### 2. Is An Award of Pre–Judgment Interest Appropriate Under the Contract?

■] Unocal argues that the district court should have approved an award of interest at 12% rather than 5.87%, and asserts that the failure to do so constituted an abuse of discretion. Although Unocal agrees that prejudgment interest is available under the OPA, Unocal argues that the court should have awarded interest at a rate of 12% per annum pursuant to the parties' contract.

As discussed above, the jury concluded that Metrolink agreed on February 21, 1995, to compensate Unocal for all expenses incurred in the cleanup effort. For the reasons explained in Footnote 2, *supra*, we have declined to review the merits of Unocal's breach of contract claim. Therefore, we have not determined whether Unocal and Metrolink actually entered into a legitimate contract, as alleged by Unocal. Nonetheless, for the purposes of reviewing the district court's prejudgment interest award, we will assume that the jury verdict was correct, and that the parties entered an oral contract in February 1995.

Unocal explains that, pursuant to the purported contract, Unocal sent three written invoices to Metrolink during the cleanup project. Each of these documents stated that interest would be charged at a rate of 1% per month if the debt was not paid within 30 days. Unocal argues that this contractual rate of interest should bind the parties, and that the district court abused its discretion by failing to award interest at a rate of 12%.

Unocal relies on section 3287 of the California Civil Code. Section 3287 provides for an award of prejudgment interest whenever a plaintiff prevails in a breach of contract claim for an amount of damages that is certain or is capable of being made certain by calculation. The legal rate of interest is ten percent, CAL. CIV. CODE § 3289(b), but Unocal does not request ten percent interest in this appeal. Rather, Unocal points out that, where the rate of interest is stipulated by contract, that rate shall apply. *See* CAL. CIV. CODE § 3289(a). Because the invoices sent by Unocal to Metrolink indicated an interest rate of 12%, Unocal argues that that rate should apply.

Unocal relies on *United States ex rel. Industrial Lumber Co. v. F.D. Rich Co.*, 473 F.2d 720 (9th Cir.1973), to support its argument. In *F.D. Rich*, the parties entered a contract for millwork and plywood. *Id.* at 722. Along with the shipments of goods, the supplier sent invoices to the buyer, each of which indicated that an annual interest rate of 8% would be applied on late payments. *Id.* When the buyer refused to pay for the goods, the district court granted judgment for the supplier on the breach of contract claim and awarded prejudgment interest at a rate of 7% per year. *Id.* at 723. On appeal, the Ninth Circuit reversed the interest award, holding that, under section 3289, the supplier should have received the 8% that was due under the terms of the invoices. *Id.* at 726.

Unocal argues that *F.D. Rich* is binding in this case, and that a 12% interest rate is therefore appropriate. We disagree. In *F.D. Rich*, the parties had a seven-year history of business relations, and the court noted that all of the supplier's invoices in the record provided for the same rate of interest. 473 F.2d at 722. Although the *F.D. Rich* court addressed the issue only summarily, the court's discussion appears to imply that the rate on the invoices was a figure voluntarily agreed upon by the parties. Here, in contrast, nothing in the

propriate under the OPA in claims against "responsible parties." 33 U.S.C. § 2705(a). Because the defendant was not a "responsible party," the district court denied the plaintiff's request for prejudgment interest. *Id.* at 1454.

In this case, in contrast, the jury found that Metrolink and K & K *were* responsible parties under the OPA. Therefore, *National Shipping* is inapposite, and an award of prejudgment interest is appropriate here.

record indicates that the parties agreed to a 12% interest rate. Rather, Unocal appears to have arrived at the 12% figure unilaterally. Accordingly, *F.D. Rich* does not apply.

We see no reason to apply section 3289(a) in this case. Section 3289(a), by its terms, applies when two parties have agreed to a given interest rate. The evidence does not support such an inference here. Instead, it appears that Unocal unilaterally chose the 12% rate which appears in the invoices. It would be patently inequitable to bind Metrolink to the 12% rate, which, by all indications, was not stipulated by both parties. Such an award seems to fall outside the scope of section 3289(a). Therefore, we affirm the district court's award of interest at a rate of 5.87%.

### B. Attorney's Fees

■ Unocal next argues that the district court improperly denied its request for attorney's fees. Generally, a prevailing party may not recover fees after judgment in the absence of some affirmative authorization. *See Stanton Road Assocs. v. Lohrey Enter.*, 984 F.2d 1015, 1018 (9th Cir. 1993); CAL. CIV. PROC. CODE § 1021. Unocal posits three arguments to support its position that the general rule should not apply in this case. None of Unocal's arguments succeed. Accordingly, we affirm the district court's order denying Unocal's application for attorney's fees.

### 1. Fees under the OPA

■ First, Unocal argues that the district court should have awarded attorney's fees pursuant to the OPA. This court reviews the district court's interpretations of federal and state statutes *de novo. See Alexander v. Glickman*, 139 F.3d 733, 735 (9th Cir.1998). The statute provides:

> At the request of the Secretary, the Attorney General shall commence an action on behalf of the Fund to recover any compensation paid by the Fund to any claimant pursuant to this chapter, and all costs incurred by the Fund by

reason of the claim, including ... attorney's fees.

33 U.S.C. § 2715(c).

A recent Ninth Circuit decision addressed this provision, and its discussion is useful in resolving the present case. *See United States v. Hyundai Merchant Marine Co.*, 172 F.3d 1187 (9th Cir.1999). In *Hyundai*, the United States government sued a responsible party for costs incurred by the Coast Guard in monitoring the cleanup of an oil spill. 172 F.3d at 1189. The Ninth Circuit approved an award of fees to the government at the close of the case, reasoning that section 2715's attorney's fees provision applies equally to suits on behalf of the Fund and suits on behalf of other branches of the federal government. *Id.* at 1192–99. The court concluded that, because the government's recovery would be paid into the Fund, a denial of attorney's fees to the Coast Guard would defeat the purpose of the OPA. *Id.*

Unocal attempts to extend this reasoning one step further, arguing that, as a vindicated owner/operator, it, too, is subrogated to the rights which the Fund might have asserted had it filed the claim. Unocal points to 33 U.S.C. § 2702(d)(1)(B), which states that a responsible party who pays for removal costs after a spill and later alleges that the spill was caused by an unrelated third party "shall be entitled by subrogation to all rights of the United States Government and the claimant to recover removal costs or damages from the third party or the Fund."

Unocal argues that this provision grants to the "responsible party" all the rights of the federal government in a suit under the OPA, including the right to fees discussed in *Hyundai*. However, this argument contradicts the plain language of section 2702(d), which provides for subrogation only to the government's right to recover *removal costs or damages* from a third party. In other words, section 2702(d) permits owner/operators such as Unocal to sue for damages in the stead of the U.S.

government, but does not necessarily give to the responsible party the benefit of *all the rights* held by the federal government. Accordingly, Unocal cannot recover fees in the stead of the federal government.

The OPA specifically permits fee awards for the government, not for private parties. Unocal's interpretation of the statute skews that provision to require an award of fees in *every* suit by a responsible party against a third party. In the absence of congressional or contractual authority, the court cannot award fees to a prevailing party. *See Stanton Road,* 984 F.2d at 1018. The district court properly denied Unocal's fee request under the OPA.

### 2. Fees Under the "Tort of Another" Doctrine

█ Unocal next asserts that the district court should have awarded fees pursuant to California's "tort of another doctrine," codified at California Code of Civil Procedure section 1021.6. Section 1021.6 permits a court to award attorney's fees to the prevailing party in an action for implied indemnity if the court finds, among other things, that "the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by bringing an action against or defending an action by a third person." Unocal argues that it deserves fees under this provision because it was forced to incur the costs of rendering a defense under the OPA, when the true tortfeasor in the case was Metrolink.

The district court properly rejected Unocal's argument, noting that section 1021.6 applies only where the prevailing party has been required to bring or defend an action against a third person. *See Wilson, McCall & Daoro v. American Qualified Plans, Inc.,* 70 Cal.App.4th 1030, 1037, 83 Cal.Rptr.2d 192 (1999). In this case, Unocal neither brought nor defended any action against any third party prior to filing this suit. Therefore, the "tort of another" doctrine simply does not apply.

In this appeal, Unocal relies on the subrogation provision of 33 U.S.C. § 2715(a). That section provides that a party who pays a "claimant" for removal costs or damages shall be subrogated to the rights and claims of that claimant. Unocal argues that, under section 2715, it has stepped into the shoes of the vendors whom it paid to perform the cleanup. Because Unocal has taken the place of the vendors in this suit, it argues that this suit is "akin" to a hypothetical action in which the vendor/claimants sue Unocal, and Unocal, in turn, sues Metrolink for indemnity. Under this line of reasoning, the instant action may be viewed as an indemnity suit in which Unocal, an innocent party, is suing Metrolink to indemnify it against the hypothetical claims of the vendors.

Unocal's attempts to extend section 1021.6 are unavailing. Section 2715(a) does not transform this action into a three-way suit with an invisible third party. This action is one for damages between two parties. As the district court explained, Unocal did not sue a third party and did not defend any third party suit. We decline Unocal's invitation to concoct a "ghost" party in order to fit this case within the "tort of another" doctrine. To apply the doctrine in this case would extend the California statute far beyond its mandate. Accordingly, we conclude that the district court did not abuse its discretion in declining to award fees under section 1021.6.

### 3. Fees Under "Private Attorney General" Doctrine

█ Finally, Unocal argues that attorney's fees are appropriate under California's "private attorney general" doctrine. This doctrine, codified at California Code of Civil Procedure section 1021.5, authorizes the award of attorney's fees to a party who has successfully prosecuted an action which has "resulted in the enforcement of an important right affecting the public interest." CAL. CIV. PROC. CODE § 1021.5. Such an award is appropriate if

three requirements are met: (1) "a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons," (2) "the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate," and (3) "such fees should not in the interest of justice be paid out of the recovery, if any." *Id.*

■ The purpose of the "private attorney general" doctrine is to encourage suits of societal importance which private parties would not otherwise have an incentive to pursue. *See Advanced Micro Devices, Inc. v. National Semiconductor Corp.*, 38 F.Supp.2d 802, 815 (N.D.Cal.1999). Section 1021.5 was not designed "as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest." *Id.* Therefore, in determining whether to exercise its discretion to award fees under the doctrine, the district court must consider whether the plaintiff's own interests are sufficient to motivate such a suit, or whether plaintiffs in actions of this kind require the additional carrot of shifted fees to ensure that the public interest will be vindicated. *See Galante Vineyards v. Monterey Peninsula Water Management Dist.*, 60 Cal.App.4th 1109, 1127–28, 71 Cal. Rptr.2d 1 (1997).

In this case, the balance is straightforward, and the district court properly considered the parties' interests. Despite Unocal's protestations to the contrary, the purpose of this lawsuit was not to protect the public from future environmental disasters. Rather, the goal of Unocal's suit was merely to shift the burden of paying for the cleanup from Unocal to Metrolink. Unocal was not acting as a private attorney general in this case, and the district court did not abuse its discretion in denying fees on this ground.

## C. Declaratory Judgment

■ Finally, Unocal argues that the district court should have issued a declaratory judgment declaring that (1) Metrolink and K & K are the responsible parties for the purposes of future litigation, and (2) Metrolink and K & K should be substituted for Unocal on the hazardous waste manifests for the disposal of wastes and materials generated by this incident. The district court denied Unocal's request by written order on November 6, 1998. Because the district court's failure to issue a declaratory judgment turned on a question of statutory interpretation, this court reviews it *de novo. See Alexander,* 139 F.3d at 735.

Unocal bases its request on the OPA provision found at 33 U.S.C. § 2717(f)(2). That section provides:

> In any ... action [for the recovery of removal costs] described in this subsection, the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages.

33 U.S.C. § 2717(f)(2). We hold that the OPA required the district court to issue a declaration in this case. The statute is clear in its mandate. The question that we must address is precisely what the district court should have declared.

### 1. "Responsible Party"

■ First, Unocal requested that the district court issue a declaration stating that Metrolink and K & K are "the responsible parties" for the purposes of future litigation. Unocal points out that the jury found Metrolink and K & K to be the sole causes of the spill, and, according to section 2702(d)(1)(A), those parties must therefore be treated as "the responsible parties" for the purposes of determining liability. On October 5, 1998, Unocal requested that the district court issue a declaration to that effect.

The district court rejected Unocal's request because, in its view, section 2717(f)(2) does not relieve a pipeline owner/operator of *any and all* potential future liability related to the spill. The court expressed concern that a broad declaration such as the one requested by Unocal would unjustly insulate Unocal from liability stemming from claims that it negligently *cleaned up* the discharged oil.

The district court's concern is a valid one. Section 2717(f)(2) only requires the court to issue a declaration of liability for *removal costs or damages*. The declaration need not act as a prophylactic measure preventing any future suits against Unocal for any act relating to the spill. Rather, the declaration must state only what the statute commands: that Metrolink and K & K, not Unocal or ERST, are liable for removal costs and damages caused by the spill. The district court's decision not to grant Unocal's requested declaration was proper.

### 2. Substitution of Names in Waste Manifests

Second, Unocal requested a declaration that Metrolink and K & K should be substituted for Unocal on the hazardous waste manifests for disposal of waste materials generated by the spill. Under California and federal law, every party involved in the generation, transportation or disposal of waste must complete a "manifest." CAL. HEALTH & SAFETY CODE § 25160; 42 U.S.C. § 6922(a)(5). Among those required to complete manifests are "generators" of hazardous waste, defined in federal regulations as any person "whose act or process produces hazardous waste ... or whose act first causes a hazardous waste to become subject to regulation." 40 C.F.R. § 260.10.

It appears that Unocal completed and filed a number of manifests to record the cleanup and transportation of spilled oil in the wake of the 1995 incident. Unocal now requests that its name be replaced on each of those manifests with the names of Metrolink and K & K. We reject Unocal's request for two reasons. First, Unocal has provided no support for the premise that it should no longer be considered a "generator" of waste as a result of the jury verdict. Second, Unocal's requested declaration is far afield from the declaration required by section 2717(f)(2), which addresses only liability for cleanup costs and damages. The OPA says nothing about "generators" of waste or the completion of manifests. Neither the statute nor the jury verdict supports Unocal's request. Therefore, we decline to reverse the district court on this question.

### 3. Conclusion

As discussed above, the district court should have issued a declaration upon request stating that Metrolink and K & K were liable for costs and damages caused by the spill. However, the district court did not err in rejecting Unocal's arguments detailed above. We now remand to the district court to issue an appropriate declaration within the mandate of 33 U.S.C. § 2717(f)(2).

AFFIRMED IN PART AND REMANDED